**ORIGINAL**

AO 241 (Rev. 5/85)    PETITION UNDER 28 USC § 2254 FOR WRIT OF
HABEAS CORPUS BY A PERSON IN STATE CUSTODY

0 6    1 4 2

| United States District Court | District<br>Delaware | |
|---|---|---|
| Name ROLAND WILLIAMS | Prisoner No. 454319 | Case No. 0102014259 |

Place of Confinement

**Sussex Correctional Institution**

| Name of Petitioner (include name under which convicted) | Name of Respondent (authorized person having custody of petitioner) |
|---|---|
| ROLAND WILLIAMS    V. | Richard Kearney, Warden |

The Attorney General of the State of:    Delaware

## PETITION

1. Name and location of court which entered the judgment of conviction under attack __The Superior Court__ __Kent County 38 The Green Dover, Delaware 19901.__

2. Date of judgement of conviction __May 23, 2003.__

3. Length of sentence __Life imprisonment as a habitual Offender.__

4. Nature of offense involved (all counts) __ONE COUNT OF DELIVERY OF COCAINE, ONE COUNT OF DELIVERY OF A NARCOTIC SCHEDULE II CONTROLLED SUBSTANCE WITH IN 300 FEET OF A CHURCH, ONE COUNT OF CONSPIRACY IN THE SECOND DEGREE.__

5. What was your plea? (Check one)
   (a) Not guilty ☑
   (b) Guilty ☐
   (c) Nolo contendere ☐

   If you entered a guilty plea to one count or indictment, and a not guilty plea to another count or indictment, give details:

   _____

6. If you pleaded not guilty, what kind of trial did you have? (Check one)
   (a) Jury ☑
   (b) Judge only ☐

7. Did you testify at the trial?
   Yes ☑  No ☐

8. Did you appeal from the judgement of conviction?
   Yes ☑  No ☐

FILED
MAR - 1 2006
U.S. DISTRICT COURT
DISTRICT OF DELAWARE

(2)

AO 241 (Rev. 5/85)

9. If you did appeal, answer the following:

   (a) Name of court _THE SUPREME COURT OF THE STATE OF DELAWARE._

   (b) Result _THE SUPREME COURT AFFIRMED MOVANT'S CONVICTION._

   (c) Date of result and citation, if known _JUNE 4, 2004._

   (d) Grounds raised _CONSTITUTIONAL ERROR_

   (e) If you sought further review of the decision on appeal by a higher state court, please answer the following:

     (1) Name of court _____ N/A

     (2) Result _____

     (3) Date of result and citation, if known _____

     (4) Grounds raised _____

   (f) If you filed a petition for certiorari in the United States Supreme Court, please answer the following with respect to each direct appeal:

     (1) Name of court _____

     (2) Result _____

     (3) Date of result and citation, if known _____

     (4) Grounds raised _____

     N/A

10. Other than a direct appeal from the judgment of conviction and sentence, have you previously filed any petitions, applications, or motions with respect to this judgment in any court, state or federal?

   Yes ☒  No ☐

11. If your answer to 10 was "yes," give the following information:

   (a) (1) Name of court _THE SUPERIOR COURT KENT COUNTY DOVER, DELAWARE_

      (2) Nature of proceeding _MOTION FOR POST-CONVICTION RELIEF_

      (3) Grounds raised _INEFFECTIVE ASSISTANCE, PROSECUTORIAL MISCONDUCT._

AO 241 (Rev. 5/85)

---

(4) Did you receive an evidentiary hearing on your petition, application or motion?
Yes☐ No☒

(5) Result _____ *N/A* _____

(6) Date of result _____

(b) As to any second petition, application or motion give the same information:

(1) Name of court _____

(2) Nature of proceeding _____

(3) Grounds raised _____

*N/A*

(4) Did you receive any evidentiary hearing on your petition, application or motion?
Yes☐ No☒

(5) Result _____ *N/A* _____

(6) Date of result _____

(c) Did you appeal to the highest state court having jurisdiction the result of action taken on any petition, application or motion?

(1) First petition, etc.    Yes☒    No☒

(2) Second petition, etc.    Yes☐    No☒

(d) If you did not appeal from the adverse action on any petition, application or motion, explain briefly why you did not:
BECAUSE MOVANT PETITION WAS BARRED BY THE SUPERIOR COURT IN KENT COUNTY DELAWARE

---

12. State *concisely* every ground on which you claim that you are being held unlawfully. Summarize *briefly* the *facts* supporting each ground. If necessary, you may attach pages stating additional grounds and *facts* supporting same.

CAUTION: In order to proceed in the federal court, you must ordinarily first exhaust your available state court remedies as to each ground on which you request action by the federal court. If you fail to set forth all grounds in this petition, you may be barred from presenting additional grounds at a later date.

AO 241 (Rev. 5/85)

For your information, the following is a list of the most frequently raised grounds for relief in habeas corpus proceedings. Each statement preceded by a letter constitutes a separate ground for possible relief. You may raise any grounds which you may have other than those listed if you have exhausted your state court remedies with respect to them. However, *you should raise in this petition all available grounds* (relating to this conviction) on which you base your allegations that you are being held in custody unlawfully.

Do not check any of these listed grounds. If you select one or more of these grounds for relief, you must allege facts. The petition will be returned to you if you merely check (a) through (j) or any one of these grounds.

(a) Conviction obtained by plea of guilty which was unlawfully induced or not made voluntarily with understanding of the nature of the charge and the consequences of the plea.

(b) Conviction obtained by use of coerced confession.

(c) Conviction obtained by use of evidence gained pursuant to an unconstitutional search and seizure.

(d) Conviction obtained by use of evidence obtained pursuant to an unlawful arrest.

(e) Conviction obtained by a violation of the privilege against self-incrimination.

(f) Conviction obtained by the unconstitutional failure of the prosecution to disclose to the defendant evidence favorable to the defendant.

(g) Conviction obtained by a violation of the protection against double jeopardy.

(h) Conviction obtained by action of a grand or petit jury which was unconstitutionally selected and impaneled.

(i) Denial of effective assistance of counsel.

(j) Denial of right of appeal.

A. Ground one: CONSTITUTIONAL ERROR ( VIE ) INEFFECTIVE ASSISTANCE OF COUNSELOR.

Supporting FACTS (state *briefly* without citing cases or law) Movant claim that counselor knew that the motion for court order concerning assignment of prosecutor had only a slim chance or no legal rule or precedent to support it in a letter dated January 6, 2003, after the motion was denied by the Superior court because counselor showed no bias or claim. counselor knowingly refiled the motion to the Supreme court on movant final appeal without acknowledging the conflict at hand. See affidavit that show in fact that counselor knew of the conflict.

B. Ground two: INEFFECTIVE ASSISTANCE OF COUNSELOR

Supporting FACTS (state *briefly* without citing cases or law) Movant claim that counselor knew from the diagram Exhibit E that was presented into evidence in movant defense that the testimony that the prosecution witness William Scott, gave during movants first trial and movant second trial was false. according to the testimony that was given by the States expert witness officer James Hosfelt who testified that movant was at a totally different crime scene, testimony that was false evidence to movant case. counselor should have object or impeach both state witnesses.

(5)

AO 241 (Rev. 5/85)

C.  Ground three: INEFFECTIVE ASSISTANCE OF COUNSELOR

Supporting FACTS (state *briefly* without citing cases or law) Movant Claim that his rights was violated When counseloR Never allowed movant to have present Sherelle morris, OR Steffone powell, Witnesses that would have been an intricate part to movant defense Strategy. also witness'es that was brought up all through out the Course of movant's prosecution. and movant never got the chance to Confront them.

D.  Ground four: PROSECUTORIAL MISCONDUCT (vie) INEFFECTIVE ASSISTANCE OF COUNSELOR

Supporting FACTS (state *briefly* without citing cases or law) Movant Claim that the prosecutoR Allowed movant to be convicted on false testimony at movant first trial and at movant second trial, and after a conflict about Steffone powell police report that movant counselor presented into evidence which Cause the prosecutor to call movant a laiR, and vouch for the credibility of the state witness'es in movant first trial. it was ineffective assistance When counselor put the police report in evidence at movant second trial.

13. If any of these grounds listed in 12A, B, C, and D were not previously presented in any other court, state or federal, state *briefly* what grounds were not so presented, and give your reasons for not presenting them: Movant did not pre-Sent ground fourR on direct appeal. because when movant Re-quested his pRioR Counsel to appeal his Claim movant was denied. that is the reason Why movant motion was baRRed.

14. Do you have any petition or appeal now pending in any court, either state or federal, as to the judgement under attack?
    Yes☐  No☑

15. Give the name and address, if known, of each attorney who represented you in the following stages of the judgment attacked herein:
    (a) At preliminary hearing Sandra W. DEAN, public deFendeR of the State of delaware The Sykes Building 45 The Green Dover, DE 19901.
    (b) At arraignment and plea Sandra W. DEAN, public defendeR of the State of delaware The Sykes Building 45 The Green Dover, DE 19901.

AO 241 (Rev. 5/85)

(c) At trial _Sandra W. DEAN, public defender of the State of Delaware The Sykes Building 45 The Green Dover, DE 19901._

(d) At sentencing _Sandra W. DEAN, public defender of the State of Delaware The Sykes Building 45 The Green Dover, DE 19901._

(e) On appeal _Sandra W. DEAN, public defender of the State of Delaware The Sykes Building 45 The Green Dover, DE 19901_

(f) In any post-conviction proceeding _PRO 'se_

(g) On appeal from any adverse ruling in a post-conviction proceeding _N/A_

16. Were you sentenced on more than one count of an indictment, or on more than one indictment, in the same court and at the same time?
    Yes☐  No☑

17. Do you have any future sentence to serve after you complete the sentence imposed by the judgment under attack?
    Yes☐  No☑

    (a) If so, give name and location of court which imposed sentence to be served in the future: _N/A_

    (b) Give date and length of the above sentence: _N/A_

    (c) Have you filed, or do you contemplate filing, any petition attacking the judgment which imposed the sentence to be served in the future?
    Yes☑  No☐

    Wherefore, petitioner prays that the Court grant petitioner relief to which he may be entitled in this proceeding.

    _____
    **Signature of Attorney (if any)**

    I declare under penalty of perjury that the fore going is true and correct. Executed on

    _2/24/06_
    (date)

    _Roland Williams_
    **Signature of Petitioner**

I/M: Roland Williams BLDG. MSB-SCU D-1
SUSSEX CORRECTIONAL INSTITUTION
P.O. BOX 500    SBI # 484319
GEORGETOWN, DELAWARE 19947

To: clerk
U.S. DIST. COURT OF Delaware
Lockbox 18
844 N. King St.
Wilmington DE 19801

PRIORITY MAIL
UNITED STATES POSTAL SERVICE

IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

IN AND FOR KENT COUNTY

| | | |
|---|---|---|
| STATE OF DELAWARE, | ) | |
| | ) | |
| v. | ) | IK01-03-0053-R1 |
| | ) | |
| ROLAND WILLIAMS | ) | |
| | ) | |
| Defendant | ) | |
| ID. No. 0102014259 | ) | |

## COMMISSIONER'S REPORT AND RECOMMENDATIONS

### Upon Defendant's Motion For Postconviction Relief Pursuant to Superior Court Criminal Rule 61

James Kriner, Esq., Deputy Attorney General, Wilmington, Delaware for the State of Delaware.

Roland Willams, *Pro se*.

FREUD, Commissioner
July 12, 2005

In August, 2001, the Defendant, Roland Williams, ("Williams"), was found guilty by a jury on one count of Delivery of Cocaine, 16 *Del. C.* § 4716(b)(4) . Williams had also been facing one count of Delivery of a Narcotic Schedule II Controlled Substance Within 300 Feet of a Church, 16 *Del. C.* § 4768 and one count

*State v. Williams*
ID 0102014259
July 12, 2005

of Conspiracy in the Second Degree, 11 *Del. C.* § 512. Prior to sentencing the State filed a motion to have Williams declared a Habitual Offender due to his past felony convictions. On December 13, 2001, following a hearing, the Court granted the State's motion and proceeded to sentence Williams to life imprisonment pursuant to 11 *Del. C.* § 4214(b). A timely Notice of Appeal was filed on January 10, 2002. The Delaware Supreme Court reversed and remanded the conviction.[1] The sole basis for remand was improper prosecutorial argument.

Prior to the second trial, Defense Counsel moved to have a different Prosecutor assigned to the case. The Court denied the motion.[2] At the retrial, January 22 - 23, 2003, Williams was again convicted of Delivery of Cocaine.[3] The State again moved to declare Williams a Habitual Offender. Prior to sentencing, at the hearing, the Court found Williams to be a Habitual Offender. As a consequence, on May 23, 2003, Williams was sentenced to life imprisonment as a habitual offender. Williams appealed the second conviction to the State Supreme Court which affirmed his conviction and sentence.[4] Williams now requests post-conviction relief based on ineffective assistance of counsel and prosecutorial misconduct.

## FACTS

The following is a summary of the facts as noted by the Supreme Court in its

---

[1]   *Williams v. State*, 803 A.2d 927 (Del. 2002)

[2]   *State v. Williams*, 2003 Del. Super. LEXIS 19.

[3]   Prior to the second trial the State *nolle prossed* the two other charges.

[4]   *Williams v. State*, 2004 Del. LEXIS 238.

2

*State v. Williams*
ID 0102014259
July 12, 2005

first opinion:[5]

> On the evening of February 15, 2001, police were conducting surveillance of the Kent Apartments on New Street in Dover, Delaware, a high drug area. Officer Hosfelt of the Dover Police Department was positioned behind a second floor window with an unobstructed view of New Street, which was about fifty feet from the window. Officer Hosfelt observed Williams on the street below, and saw him approach a car that had pulled over in front of the Kent Apartments. Through an open window, Officer Hosfelt heard Williams ask the driver of the vehicle what he wanted. The driver was one William Scott, who drove to New Street that evening, alone, in order to purchase cocaine. Scott testified that he asked Williams for a twenty dollar piece of crack cocaine.

> Officer Hosfelt further testified that he saw Scott hand Williams some money. Then, according to the officer, a third man came out of a nearby residence and took the money from Williams. That man then passed drugs to Williams, which Williams immediately handed to Scott. At this point, Officer Hosfelt radioed in what he had witnessed and Scott was apprehended a short distance away. The police found a piece of crack cocaine in a baggie in Scott's car. Meanwhile, Officer Hosfelt maintained surveillance of Williams and directed another police car to respond to his location and place Williams under arrest. After his arrest, Scott was brought back to the scene of the drug buy and asked to identify the seller. By this time, Williams had already been arrested. Scott identified Williams as the person who sold him the crack cocaine.

> At trial, Williams testified in his own defense that the third man had conducted the drug deal with Scott entirely on his own, and that he, Williams, was simply in the wrong place at the wrong time. The jury returned a guilty verdict on the single count charged and this appeal

---

<sup>5</sup>    *Williams v. State*, 803 A.2d 927 (2002).

3

*State v. Williams*
ID 0102014259
July 12, 2005

followed.

## WILLIAMS' CONTENTIONS

Williams filed the instant Motion for Postconviction Relief pursuant to Superior Court Rule 61. In his motion, he raises the following six grounds for relief:

> Ground One: Ineffective Assistance of Counsel (VIA) [*sic*].
> Movant claim [*sic*] that Defense counsel did not object or impeach state witnesses doing [*sic*] both trials, knowingly [*sic*] that William Scott [*sic*], testimony was false according to the State's expert witness Officer James Hosfelt, testimony which put movant to a different location.
>
> Ground Two: Ineffective Assistance of Counsel.
> Movant claim [*sic*] Counsel knew that motion concerning assignment of prosecutor had very little chance or no legal rule or precedent to support it. After motion was denied by a lower court because counsel showed no bias or claim, counsel knowingly refile [*sic*] motion poorly [*sic*] in movant defense.
>
> Ground Three: Prosecutor Misconduct (VIA) [*sic*] Conflict of Counsel.
> Movant claim [*sic*] that the prosecutor in his final summation should not have been confined to a repetition of the evidence presented at trial which was the credibility of the state witnesses, movant also claim [*sic*] that the prosecutor misstated William Scott [*sic*] testimony in closing arguements [*sic*] by saying that he never testified that he was under the influence. Movant also can show in fact that the prosecutor suggested that William Scott has

4

[*sic*] no motives not to tell the truth.

Ground Four: Ineffective Assistance of Counsel (VIA) [*sic*] denial right to confront witnesses.
Movant claim [*sic*] that his constitutional rights was [*sic*] violated when defense counsel never allowed movant to present witnesses that would have been an intricate part to movant defense strategy.

Ground Five: Ineffective Assistance of Counsel (VIA) [*sic*] Denial impeachment opportunity: Movant claim [*sic*] that it was his disadvantage for counsel not to argue the evidence at movant's second trial when testimony was given by the State's expert witness at movant's first trial showed in fact that the evidence was picked up from police department on February 28, 2001 and did not arrive at the medical examiner's office until March 1, 2001.

Ground Six: Prosecutorial Misconduct (VIA) [*sic*] Conflict of Interest.
Movant claim [*sic*] the prosecutor knowingly presented false testimony into evidence when the State witness William Scott, testified in 2001 and in 2003.

## PROCEDURAL CONSIDERATIONS

Under Delaware Law the Court must first determine whether Williams has met the procedural requirements of Superior Court Criminal Rule 61(i) before it may consider the merits of the postconviction relief claims.[6] Under Rule 61, postconviction claims for relief must be brought within three years of the conviction becoming final.[7] Williams' motion was filed in a timely fashion, thus the bar of Rule 61(i)(1) does not apply to the motion. As this is Williams' initial motion for postconviction

---

[6]  *Bailey v. State*, 588 A.2d 1121, 1127 (Del. 1991); *Younger v. State*, 580 A.2d 552, 554 (Del. 1990) (*citing Harris v. Reed*, 489 U.S. 255 (1989)); *See Dawson v. State*, 673 A.2d 1186, 1190 (Del. 1996).

[7]  Super. Ct. Crim. R. 61(i)(1).

*State v. Williams*
ID 0102014259
July 12, 2005

relief, the bar of Rule 61(i)(2), which prevents consideration of any claim not previously asserted in a postconviction motion, does not apply either.

Grounds for relief not asserted in the proceedings leading to judgment of conviction are thereafter barred unless the movant demonstrates: (1) cause for the procedural fault and (2) prejudice from a violation of the movant's rights.[8] The bars to relief are inapplicable to a jurisdictional challenge or to a colorable claim or miscarriage of justice stemming from a constitutional violation that "undermines the fundamental legality, reliability, integrity or fairness of the proceeding leading to the judgment of conviction."[9]

Williams' third and sixth grounds for relief allege no cause for not raising them on direct appeal or at trial and as such they are clearly barred by rule 61(i)(3). Williams has not overcome the procedural bar as to these two claims and the Court should deny them. Williams' first, second, fourth and fifth claims, however, are premised on allegations of ineffective assistance of counsel. These types of claims are not normally subject to the procedural default rule, in part because the Delaware Supreme Court will not generally hear such claims for the first time on direct appeal. For this reason, many defendants, including Williams, allege ineffective assistance of counsel in order to overcome the procedural default.

However, this path creates confusion if the defendant does not understand that the test for ineffective assistance of counsel and the test for cause and prejudice are

---

[8]    Super. Ct. Crim. R. 61(i)(3).

[9]    Super. Ct. Crim. R. 61(i)(5).

6

*State v. Williams*
ID 0102014259
July 12, 2005

distinct, albeit similar, standards.[10] The United States Supreme Court has held that:

> [i]f the procedural default is the result of ineffective assistance of counsel, the Sixth Amendment itself requires that responsibility for the default be imputed to the State, which may not "[conduct] trials at which persons who face incarceration must defend themselves without adequate legal assistance"[;] [i]neffective assistance of counsel, then, is cause for a procedural default.[11]

A movant who interprets the final sentence of the quoted passage to mean that he can simply assert ineffectiveness and thereby meet the cause requirement will miss the mark. Rather, to succeed on a claim of ineffective assistance of counsel, a movant must engage in the two part analysis enunciated in *Strickland v. Washington*[12] and adopted by the Delaware Supreme Court in *Albury v. State*.[13]

The *Strickland* test requires the movant show that counsel's errors were so grievous that his performance fell below an objective standard of reasonableness.[14] Second, under *Strickland* the movant must show there is a reasonable degree of probability that but for counsel's unprofessional error the outcome of the proceedings

---

[10]    *State v. Gattis*, 1995 Del. Super. LEXIS 399, at *13.

[11]    *Murray v. Carrier*, 477 U.S. 478, 488 (1986).

[12]    466 U.S. 668 (1984).

[13]    551 A.2d 53, 58 (Del. 1988).

[14]    466 U.S. at 687-88; *see Dawson v. State*, 673 A.2d 1186, 1190 (Del. 1996).

7

*State v. Williams*
ID 0102014259
July 12, 2005

would have been different, that is, actual prejudice.[15]  In setting forth a claim of ineffective assistance of counsel, a defendant must make and substantiate concrete allegations of actual prejudice or risk summary dismissal.[16]

Generally, a claim for ineffective assistance of counsel fails unless both prongs of the test have been established.[17]  However, the showing of prejudice is so central to this claim that the *Strickland* court stated "[i]f it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed."[18]  In other words, if the Court finds that there is no possibility of prejudice even if a defendant's allegations regarding counsel's representation were true, the Court may dispose of the claim on this basis alone.[19]  Furthermore, the defendant must rebut a "strong presumption" that trial counsel's representation fell within the "wide range of reasonable professional

---

[15]    466 U.S. at 694; *see Dawson*, 673 A.2d at 1190; *Accord, e.g., Zebroski v. State*, 822 A.2d 1038, 1043 (Del. 2003); *Ayers v. State*, 802 A.2d 278, 281 (Del. 2002); *Steckel v. State*, 795 A.2d 651, 652 (Del. 2002); *Johnson v. State*, 813 A.2d 161, 167 (Del. 2001); *Bialach v. State*, 773 A.2d 383, 387 (Del. 2001); *Outten v. State*, 720 A.2d 547, 552 (Del. 1998); *Skinner v. State*, 607 A.2d 1170, 1172 (Del. 1992); *Flamer v. State*, 585 A.2d 736, 753-754 (Del. 1990).

[16]    See, *e.g., Outten v. State*, 720 A.2d 547, 552 (Del. 1998); *Righter v. State*, 704 A.2d 262, 263 (Del.1997); *Somerville v. State*, 703 A.2d 629, 632 (Del. 1997); *Skinner v. State*, 1994 Del. LEXIS 84; *Brawley v. State*, 1992 Del. LEXIS 417; *Younger v. State*, 580 A.2d 552, 556 (Del. 1990); *Robinson v. State*, 562 A.2d 1184, 1185 (Del. 1989). *Accord Wells v. Petsock*, 941 F.2d 253, 259-60 (3d Cir. 1991).

[17]    466 U.S. at 687.

[18]    *Id.* at 697.

[19]    *State v. Gattis*, 1995 Del. Super. LEXIS 399, at *13.

*State v. Williams*
ID 0102014259
July 12, 2005

assistance," and this Court must eliminate from its consideration the "distorting effects of hindsight when viewing that representation."[20]

In the case at bar, Williams attempts to show cause for his procedural default by making merely conclusory assertions of ineffectiveness of counsel. In regards to prejudice, Williams simply claims that the failure of counsel to raise certain issues was prejudicial. Under the circumstances of the case, Williams' allegations are meritless. The Supreme Court found no error in the trial. The record indicates that Williams's trial attorney did in fact adequately prepare for the trial and called all appropriate witnesses at trial.[21] Williams has utterly failed to demonstrate prejudice as a result of his counsel's alleged failure. This failure is fatal to Williams' Motion. His motion is therefore procedurally barred.[22]

## CONCLUSION

After reviewing the record in this case, it is clear that Williams has failed to avoid the procedural bars of Rule 61(i). Consequently, I recommend that Williams' postconviction motion be ***denied*** as procedurally barred by Rule 61(i)(3) for failure to prove cause and prejudice and Rule 61(i)(2) for failure to have raised grounds three and six on direct appeal.

---

[20]      466 U.S. at 689; *Dawson,* 673 A.2d at 1190; *Wright v. State,* 671 A.2d 1353, 1356 (Del. 1996).

[21]      See Affidavit of Counsel for a complete overview of Counsel's preparation for trial.

[22] *See, e.g. Wright,i* 671 A. 2d at 1356; *Wright v. State,* 1992 Del LEXIS 62; *Brawley v. State,* 1992 Del. LEXIS 417.

*State v. Williams*
ID 0102014259
July 12, 2005

Commissioner Andrea M. Freud

oc:    Prothonotary
cc:    Honorable William L. Witham, Jr.
       Sandra W. Dean, Esq.
       File

10



GRanted - one
facts



## PUBLIC DEFENDER OF THE STATE OF DELAWARE
### THE SYKES BUILDING
### 45 THE GREEN
### DOVER, DELAWARE 19901

**LAWRENCE M. SULLIVAN**
**PUBLIC DEFENDER**

**ANGELO FALASCA**
**CHIEF DEPUTY**

**SANDRA DEAN**
**ASSISTANT PUBLIC DEFENDER**

**TELEPHONE**
**(302) 739-4476**

January 6, 2003

letter to movant

Roland Williams
SBI# 00454319
Sussex Correctional Institution
RT 113
Georgetown, DE 19947

Dear Mr. Williams:

Enclosed is a copy of the Motion being filed concerning the Prosecutor in your case. This Motion has only a slim chance of success because there is no legal rule or precedent to support it. If the Motion is granted it will result in a delay of your trial date because a new Prosecutor would need time to prepare.

We are issuing a subpoena for the appearance of Sherrelle Morris at Trial. If she appears I will interview her again, and if she has testimony helpful to your case, she will be called as a witness. She did not give helpful information to our Investigator, as I have previously told you.

The record of William Scott was investigated before your first Trial. He has admitted drug use, but he has no felony convictions and no record of mental illness.

Very truly yours,

Sandra W. Dean

SANDRA W. DEAN, ESQUIRE
Assistant Public Defender

SWD/msc

enc.

Exhibit A

Wilington, Delaware 19899.



## PUBLIC DEFENDER OF THE STATE OF DELAWARE
### THE SYKES BUILDING
### 45 THE GREEN
### DOVER, DELAWARE 19901

**LAWRENCE M. SULLIVAN**
**PUBLIC DEFENDER**

**ANGELO FALASCA**
**CHIEF DEPUTY**

**SANDRA DEAN**
**ASSISTANT PUBLIC DEFENDER**

**TELEPHONE**
**(302) 739-4476**

November 6, 2003

*( letter to movant )*
*prior counselor denied movant appeal*
*Requests & and Refiled motion with-out*
*correction?*

Roland Williams
SBI# 00454319
Sussex Correctional Institution
RT 113
Georgetown, DE 19947

Dear Mr. Williams:

Enclosed is a copy of the Appellant's Opening Brief and Appendix, which have been filed with the Delaware Supreme Court.

The points in your recent letters have been carefully considered. However, an appeal is for argument of legal errors in the trial. Whether the jury did or did not believe the testimony of any witness (including you) is not a subject for appeal. *Facts*

Very truly yours,

Sandra W. Dean

SANDRA W. DEAN, ESQUIRE
Assistant Public Defender

SWD/msc

enc.

EXHIBIT "A"

SUPERIOR COURT CRIMINAL DOCKET                 Page    1
( as of   10/03/2003 )

State of Delaware v.  ROLAND WILLIAMS                    DOB: 12/22/1959
  State's Atty: JAMES J KRINER , Esq.          AKA:
  Defense Atty: SANDRA W DEAN , Esq.


Assigned Judge:

Charges:
| Count | DUC# | Crim.Action# | Description | Dispo. | Dispo. Date |
|-------|------|--------------|-------------|--------|-------------|
| 001 | 0102014259 | IK01030053 | DEL NSII CS | TG | 01/23/2003 |
| 002 | 0102014259 | IK01030054 | DIST 300' PARK | NOLP | 01/21/2003 |
| 003 | 0102014259 | K01030055 | CONSP 2ND | NOLP | 01/21/2003 |

| No. | Event Date | Event | Judge |
|-----|------------|-------|-------|
| 39 | 03/05/2002 | | |

LETTER FROM PARALEGAL OFFICE TO SANDRA DEAN, ESQUIRE
RE: ATTACHED IS CORRESPONDENCE REGARDING TRANSCRIPTS THE COURT
RECEIVED FROM THE DEFENDANT.
40   05/01/2002
DEFENDANT'S LETTER FILED.
RE:SENTENCE
41   07/25/2002
MANDATE FILED FROM SUPREME COURT:  SUPERIOR COURT JUDGMENT REVERSED.
SUPREME COURT CASE NO: 12, 2002
REASON: PROSECUTOR'S REMARKS, CHARACTERIZING THE DEFENDANT IN THIS
CASE AS "LYING"...TRIAL JUDGE SHOULD HAVE INTERVENED SUA SPONTE TO
ISSUE A CURATIVE INSTRUCTION OR ENTER A MISTRIAL.
42   09/24/2002                              RIDGELY HENRY DUPONT
CASE REVIEW CALENDAR:  SET FOR FINAL CASE REVIEW 11/12 & TRIAL
11/18/02.
43   09/26/2002
MOTION FOR PSYCHIATRIC EXAM FILED. (S. DEAN)
44   09/30/2002                              RIDGELY HENRY DUPONT
ORDER AND MOTION FOR PSYCHIATRIC/PSYCHOLOGICAL EVALUATION FILED.
DEFENDANT SHALL UNDERGO A PSYCHIATRIC/PSYCHOLOGICAL EVALUATION BY
STAFF AT:DELAWARE PSYCHIATRIC CENTER. REASON:COMPETENCY TO STAND
TRIAL, MENTAL STATUS AT THE TIME OF OFFENSE, DETERMINATION OF
PSYCHIATRIC TREATMENT NEEDS, COMPETENCY TO ENTER A PLEA.
IT IS FURTHER ORDERED THAT THE REQUESTED EVALUATION BE CONDUCTED
IMMEDIATELY; AS THE DEFENDANT IS SCHEDULED FOR TRIAL ON 11/18/02.
45   10/04/2002                              RIDGELY HENRY DUPONT
LETTER FROM DIANNE STACHOWSKI, DHSS TO JUDGE RIDGELY RE: REPORT DUE
DATE BE CONTINUED IN ORDER TO ALLOT ENOUGH TIME TO COMPLETE SAID
EVALUATION. THE NEXT AVAILABLE APPOINTMENT IS DECEMBER 5, 2002.
APPROVED.
46   10/09/2002                              WITHAM WILLIAM L. JR.
CONTINUANCE REQUEST FILED BY SANDRA DEAN, ESQ.; GRANTED BY JUDGE
WITHAM; PSYCH EVAL; TC: 11/12/02 FCR: 12/11/02 TRIAL: 12/16/02
     11/12/2002                             VAUGHN JAMES T. JR.
TRIAL CALENDAR  - CONTROL - RESCHEDULED -DEFENSE REQUEST
PSYCHS OUT
FCR 1/15/03, T 1/21/03

SUPERIOR COURT CRIMINAL DOCKET                     Page    2
( as of  10/03/2003 )

State of Delaware v.  ROLAND WILLIAMS                        DOB: 12/22/1959
State's Atty: JAMES J KRINER , Esq.          AKA:
Defense Atty: SANDRA W DEAN , Esq.

| No. | Event Date | Event | Judge |
|-----|------------|-------|-------|
| 48 | 12/09/2002 | PETITION FOR A WRIT OF HABEAS CORPUS FILED (PRO SE) REFERRED TO JUDGE: WITHAM DATE REFERRED:12/09/02 CIVIL CASE NO:02M-12-007 | |
| 49 | 12/09/2002 | MOTION FOR DISMISSAL OF COUNSELOR FILED (PRO SE). | |
| 50 | 12/10/2002 | PETITION FOR A WRIT OF HABEAS CORPUS FILED (PRO SE) REFERRED TO JUDGE: WITHAM DATE REFERRED: 12/09/02 CIVIL CASE NO: 02M-12-007 | |
| 51 | 12/10/2002 | ORDER: THE PETITION FOR WRIT OF HABEAS CORPUS IS DISMISSED | WITHAM WILLIAM L. JR. |
| 52 | 12/10/2002 | MOTION FOR CHANGE OF VENUE FILED (PRO SE). | |
| 53 | 12/20/2002 | MOTION TO DISMISS DENIED.  BAIL: $10,000.00 CASH ONLY. | WITHAM WILLIAM L. JR. |
| 54 | 12/20/2002 | MOTION FOR CHANGE OF VENUE DENIED. | WITHAM WILLIAM L. JR. |
| 55 | 12/24/2002 | MOTION TO PROCEED PRO SE FILED. | |
| 56 | 12/24/2002 | LETTER FROM DELAWARE PSYCHIATRIC CENTER RE: MR. WILLIAMS REFUSED TO SPEAK, GOT UP AND LEFT THE INTERVIEW. | |
| 57 | 01/03/2003 | SUBPOENA(S) ISSUED. | |
| 58 | 01/03/2003 | MOTION TO PROCEED PRO SE WITHDRAWN BY DEFENDANT.  PSYCHIATRIC ORDER OF 09/30/02 IS REVOKED; APPLICATION FOR PSYCHIATRIC EVALUATION IS DISMISSED WITHOUT PREJUDICE. | WITHAM WILLIAM L. JR. |
| 59 | 01/07/2003 | ORDER TO VACATE PSYCHIATRIC EXAMINATION DATED SEPTEMBER 30, 2002 WAS APPROVED BY JUDGE WITHAM ON 01/07/03. | WITHAM WILLIAM L. JR. |
| 60 | 01/07/2003 | MOTION FOR COURT ORDER CONCERNING ASSIGNMENT OF PROSECUTOR FILED. (S. DEAN) | |
| 61 | 01/10/2003 | MOTION FOR COURT ORDER CONCERNING ASSIGNMENT OF PROSECUTOR. DECISION RESERVED. | WITHAM WILLIAM L. JR. |
| 62 | 01/14/2003 | MOTION FOR COURT ORDER CONCERNING ASSIGNMENT OF PROSECUTOR IS DENIED. | WITHAM WILLIAM L. JR. |
| 63 | 01/15/2003 | FINAL CASE REVIEW:  NO PLEA/SET FOR TRIAL 1/21. | WITHAM WILLIAM L. JR. |
| | 01/21/2003 | TRIAL CALENDAR- WENT TO TRIAL JURY | WITHAM WILLIAM L. JR. |
| 65 | 01/22/2003 | MOTION FOR JURY INSTRUCTIONS FILED. (DEAN) | |

```
                    SUPERIOR COURT CRIMINAL DOCKET              Page    3
                       ( as of  10/02/2003 )
```

State of Delaware v.  ROLAND WILLIAMS                       DOB: 12/22/1959
  State's Atty: JAMES J KRINER , Esq.          AKA:
  Defense Atty: SANDRA W DEAN , Esq.

```
     Event
No.  Date            Event                          Judge
---------------------------------------------------------------------------
```

66   01/23/2003                                    WITHAM WILLIAM L. JR.
       JURY TRIAL HELD 1/21 & 1/23/03. JURY FOUND DEFENDANT GUILTY AS CHARGED
       PSI ORDERED. SENTENCED DATE 3/27/03.  S/JAMES KRINER, D/SANDRA DEAN,
       CR/J WASHINGTON, CC/R MANCHESTER, M SMALL.
67   01/30/2003
       LETTER FROM SYLVIA FOSTER, MD FORENSIC PSYCHIATRIST TO COURT FILE
       RE: FORENSIC PSYCHIATRIC EVALUATION
68   02/04/2003
       DOCUMENT(S) FILED REGARDING SUPREME COURT PETITION FOR WRIT OF HABEAS
       CORPUS. NOW THEREFORE, IT IS ORDERED THAT WILLIAMS PETITION IS HEREBY
       DISMISSED.
69   03/04/2003
       MOTION TO DECLARE DEFENDANT AN HABITUAL OFFENDER FILED. (J. KRINER)
70   03/25/2003                                    WITHAM WILLIAM L. JR.
       SENTENCING CALENDAR, SENTENCING CONTINUED 4/30/03.
71   04/29/2003
       SENTENCING CALENDAR, SENTENCING CONTINUED PER ISO MEMO.
72   05/21/2003
       LETTER FROM JIM SHEPHERD, ISO TO JUDGE WITHAM
       RE: IT IS RESPECTFULLY RECOMMENDED THAT MR. WILLIAMS' SENTENCING BE
       CHANGED TO FRIDAY, MAY 23, 2003.  APPROVED BY JUDGE WITHAM.
73   05/23/2003                                    WITHAM WILLIAM L. JR.
       SENTENCING CALENDAR: DEFENDANT SENTENCED.
74   06/24/2003
       NOTICE OF APPEAL 309, 2003
75   06/24/2003
       DIRECTIONS TO COURT REPORTER FOR TRANSCRIPT DUE NO LATER THAN 7/30/03.
76   08/07/2003
       LETTER FROM SUPREME COURT TO JENNIE WASHINGTON RE: TRANSCRIPT DUE NO
       LATER THAN 9/2/03.
77   09/05/2003
       LETTER FROM JENNIE WASHINGTON, COURT REPORTER TO SUPREME COURT
       RE: EXTENSION OF TIME TO FILE TRANSCRIPT
78   09/05/2003
       LETTER FROM SUPREME COURT TO JENNIE WASHINGTON, COURT REPORTER
       RE: REQUEST FOR EXTENSION HAS BEEN GRANTED UNTIL OCTOBER 2, 2003.
79   09/30/2003
       TRANSCRIPT OF TRIAL FILED (VOLUME A) BY COURT REPORTER JENNIE
       WASHINGTON.
80   09/30/2003
       TRANSCRIPT OF TRIAL FILED (VOLUME B) BY COURT REPORTER JENNIE
       WASHINGTON.
81   09/30/2003
       TRANSCRIPT OF SENTENCING FILED BY COURT REPORTER JENNIE WASHINGTON.
82   10/02/2003
       LETTER FROM SUPREME COURT STATING RECORD IS DUE NO LATER THAN 10/10/03
```

```
              *** END OF DOCKET LISTING AS OF  10/03/2003 ***
                      PRINTED BY: CSCRMAN
```

## IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

### IN AND FOR KENT COUNTY

| THE STATE OF DELAWARE | * | |
|---|---|---|
| | * | ID# 0102014259 |
| vs. | * | |
| | * | |
| ROLAND WILLIAMS, | * | |
| | * | |
| Defendant. | * | |

## MOTION FOR COURT ORDER CONCERNING ASSIGNMENT OF PROSECUTOR

COMES NOW, the defendant, Roland Williams, by and through his Attorney, Sandra W. Dean, Esquire, requests the Court to Order the Department of Justice to re-assign the above-captioned case to another Prosecutor for the following reasons:

1. By Order dated July 25, 2002 the Delaware Supreme Court reversed the Defendant's conviction due to an improper closing argument by the State.

2. The case was remanded for a new Trial which is scheduled for January 21, 2003.

3. By letter dated September 27, 2002 (Exhibit "A") Defense Counsel requested that the case be assigned to a different Deputy Attorney General for the reasons outlined in the letter.

4. A Deputy Attorney General represents all the people, including the Defendant. The primary goal of all parties in a criminal case should be correctly determining the guilt or innocence of the Defendant in a fair trial.

5. When a conviction is reversed due to prosecutorial error, the case should be assigned to a different Prosecutor for the re-trial. This should not reflect adversely on the original Prosecutor, but should be done simply to avoid any appearance or possibility of unfairness.

WHEREFORE, the Defendant respectfully requests that the Court sign the attached Order.

*Sandra W. Dean*

SANDRA W. DEAN, ESQUIRE
Assistant Public Defender
The Sykes Building
45 The Green
Dover, DE 19901



# PUBLIC DEFENDER OF THE STATE OF DELAWARE
## THE SYKES BUILDING
### 45 THE GREEN
### DOVER, DELAWARE 19901

LAWRENCE M. SULLIVAN
PUBLIC DEFENDER

ANGELO FALASCA
CHIEF DEPUTY

SANDRA DEAN
ASSISTANT PUBLIC DEFENDER

TELEPHONE
(302) 739-4476

September 27, 2002

Robert O'Neill, Esquire
Department of Justice
102 W. Water Street
Dover, DE 19901

     RE: State v. Roland Williams ID# 0102014259

Dear Bobby:

    Roland Williams' case was originally assigned to Martin O'Connor. Martin offered a plea to five (5) years, which was rejected. Shortly before Trial the case was re-assigned to Jim Kriner; Jim offered ten (10) years, which was rejected. At all times the State had Williams' criminal record, mostly from Florida.

    At Trial, William Scott testified that Williams sold him one piece of cocaine. Officer Hosfelt testified that another black male came out of a nearby house and handed Williams the cocaine; that Williams handed the cocaine to Scott and gave the money to the black male. Williams testified that the other man was Steffone Powell, a person known to police with at least one drug conviction. Williams said that Powell sold Scott the cocaine. Powell ran when police arrived and was never apprehended.

    Williams was convicted and pursuant to an Habitual Offender Petition was sentenced to life in prison. The Trial was unremarkable at the time and I made no objections whatsoever to Jim's closing argument. However, while the Appeal was pending the Supreme Court issued an opinion in *Alonzo W. Morris, Jr. v. State* (03/28/02) reversing a conviction based on improper closing argument. This resulted in a review of closing arguments in our pending appeals. Subsequently Williams conviction was reversed on the same basis.

    I would like a plea offer of ten (10) years or less, but no offer at all has been forthcoming.

Exhibit "A"

Without making any negative inference about Jim Kriner's ability or decisions, I believe that under the circumstances this case should be assigned to another Deputy. If I were in his place I would be annoyed if not angry, and it would be difficult to be objective.

At the time he was arrested Williams had been homeless for years, and was living in an abandoned car in Dover. The Jury sent a note asking for leniency. I cannot say with certainty that Williams would accept a plea, but the lack of a reasonable offer creates the appearance of unfairness and unreasonable harshness.

Thank you for any consideration.

Very truly yours,

Sandra W. Dean

SANDRA W. DEAN, ESQUIRE
Assistant Public Defender

SWD/msc

cc: James Kriner, Esquire

**SUPERIOR COURT**
OF THE
**STATE OF DELAWARE**

WILLIAM L. WITHAM, JR.
JUDGE

38 THE GREEN
COURT HOUSE
DOVER, DE 19901

James J. Kriner, Esquire
Department of Justice
102 West Water Street
Dover, Delaware 19901

Sandra W. Dean, Esquire
Office of the Public Defender
530 South State St., Suite 108
Dover, Delaware 19901

Re:  *State v. Roland Williams*
     *I.D. No. 0102014259*

          Submitted: January 10, 2003
          Decided: January 13, ~~2002~~
                                   2003

     On Defendant's Motion for Court Order
     Concerning Assignment of Prosecutor



Dear Counsel:

     Before this Court is Defendant's motion for reassignment of prosecutor.
Upon consideration of the motion and the oral arguments presented, it appears to
this Court that Defendant's motion should be ***denied.***

### *I. Background*

     Following a jury trial, Defendant Roland Williams was found guilty of
delivering cocaine.   Subsequently, Defendant's conviction was reversed and
remanded by the Supreme Court because of inappropriate remarks by the Prosecutor
during closing.[1]  Specifically, the Supreme Court concluded that "the prosecutor's
remarks characterizing the defendant in this case as 'lying' and proposing that the
jury must find the State's witnesses to be lying in order to acquit the defendant,

---

[1]  *Williams v. State*, 803 A.2d 927, 931 (Del. 2002).

State v. Roland Williams
I.D. No. 0102014259
Page 2

were so patently improper that the trial judge should have intervened *sua sponte* to issue a curative instruction or enter a mistrial."[2]  Upon remand, Defendant has filed numerous motions including the motion to reassign the prosecutor, which is the subject of this Order.

## *II. Analysis*

Under Title 29 of the Delaware Code, Section 2503, whenever Attorney General is referred to in the Constitution, in any statute, rules of any Court, or document "such reference or designation shall include any person duly appointed by the Attorney General."[3]  Furthermore, § 2504(6) states that the Attorney General shall have charge over all proceedings.[4]  Therefore, it seems apparent that the Attorney General or her designee shall have the power to decide which prosecutor to appoint to handle each criminal case.  This power should not be disrupted absent a specific and tangible cause.

The prosecutor in any given case has responsibilities and duties that should not be taken lightly.  According to the ABA Standards for Criminal Justice § 1.1(c) "The duty of the prosecutor is to seek justice, not merely to convict."  According to the commentary of § 1.1:

> The prosecutor stands at the most critical point in the criminal justice system.  All serious criminal cases require the participation of three

---

[2]  *Id.* at 927.

[3]  DEL. CODE. ANN. tit. 29, § 2501 (1997).

[4]  *Id.* at § 2504.

State v. Roland Williams
I.D. No. 0102014259
Page 3

> entities: a judge, counsel for the prosecution and counsel for the
> accused, and absent any one (barring valid waiver of counsel) the court
> is incomplete. In short, a "court" must be viewed as a structure with
> three legs which requires the support of all three. Although the
> prosecutor operates within the adversary system, it is fundamental that
> his obligation is to protect the innocent as well as to convict the guilty,
> to guard the rights of the accused as well as to enforce the rights of the
> public.[5]

Furthermore, "the legal profession must develop a new and acute awareness of the importance of a vigorous, fair, and efficient prosecution system," because the "character, quality and efficiency of the whole system is shaped in great measure by the manner in which [the prosecutor] exercises his broad discretionary powers."[6] In addition, ABA Standard for Criminal Justice § 5.8 specifically deals with a prosecutor's conduct when arguing before a jury stating; "It is unprofessional conduct for the prosecutor to express his personal belief or opinion as to the truth or falsity of any testimony or evidence or the guilt of the defendant."[7]

It is under this backdrop that this Court turns now to the Defendant's motion. Defense counsel argues that "when a conviction is reversed due to prosecutorial error, the case should be assigned to a different Prosecutor for the re-trial. This should not reflect adversely on the original Prosecutor, but should be done simply

---

[5] ABA Standards for Criminal Justice, *The Prosecution Function and The Defense Function*, The Prosecution Function § 1.1 (c) (1971).

[6] Commentary for ABA Standards for Criminal Justice §1.1 at 44-45.

[7] ABA Standards for Criminal Justice, *The Prosecution Function and The Defense Function*, The Prosecution Function § 5.8.

State v. Roland Williams
I.D. No. 0102014259
Page 4

to avoid the appearance or possibility of unfairness. "[8]  The defense does not provide

any support for this proposition[9] nor does she cite any specific reasons,[10] other than

the reversal in the Supreme Court, which would indicate that the assigned

Prosecutor would conduct the trial in an unfair manner.  Defense counsel relies

solely on the *perception* of unfairness.  While this is a valid issue, it does not

provide this Court with any tangible grounds to invade the province of the Attorney

General's office and demand a new prosecutor be assigned to this case, and may set

a dangerous precedent.

Moreover, assigning this case to a new prosecutor would inevitably cause a

delay in the case, as this case is currently scheduled for retrial on January 21st which

is approximately a week away.  Additionally, nothing in the Supreme Court's

opinion demands that the case be reassigned to a different prosecutor.  Surely, if the

Supreme Court had desired for this case to be reassigned it could have done so in

---

[8]  Defendant's Motion For the Court Concerning Assignment of Prosecutor.

[9]  After a review by this Court, there does not seem to be any case law in Delaware that specifically addresses this issue.

[10]  Defense Counsel does incorporate into her Motion a letter that she wrote to the Attorney General's office in which she expresses concern that she had not been offered a plea by the assigned counsel.  However, since the decision of whether to offer any plea agreement is within the sole discretion of the Attorney General's office this Court will not express an opinion as to the appropriateness of a plea offer in this case.  However, for clarity this Court will mention that the assigned Prosecutor did offer a plea to the defendant before the first trial that was rejected, and according to defense counsel's letter that plea offer is similar to the offer defense counsel is currently seeking.

Facts to GRound one

## IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

### IN AND FOR KENT COUNTY

| STATE OF DELAWARE, | * | |
| --- | --- | --- |
| | * | |
| Plaintiff, | * | |
| | * | |
| V. | * | IK 01-03-0053 R1 |
| | * | thru |
| ROLAND WILLIAMS, | * | IK 01-03-0054 R1 |
| | * | |
| Defendant. | * | |

## AFFIDAVIT OF SANDRA W. DEAN, ESQUIRE, IN ANSWER TO:

### MOTION FOR POSTCONVICTION RELIEF

1. I am a member of the Delaware Bar, having been admitted on December 13, 1990.

2. This affidavit is being filed pursuant to an Order of Commissioner Andrea Maybee Freud dated December 21, 2004 that I respond to the Defendant's allegations on or before February 4, 2005.

3. The Defendant alleges the following grounds for his assertion of ineffective assistance of counsel:

Ground 1. Movant claim that defense counsel did not object or impeach state witness' during both trials. Knowing that William Scott, testimony was false according to the State's expert witness Officer James Hosfelt, testimony which put movant at a different location.

A. Denied.

Enclosed are transcripts of cross-examination of State's witnesses William Scott and James Hosfelt:

Exhibit "A": First trial, Scott: A-80 - A-92.

Exhibit "B": First trial, Hosfelt: A-124 - A-131

Exhibit "C": Second trial, Scott: A-30 - A-38

Exhibit "D": Second trial, Hosfelt: A-59 - A-66

Ground 2. Movant claim that counsel knew that motion concerning assignment of prosecutor had very little chance or no legal rule or precedent to support it. After motion was denied by a lower court because counsel showed bias or claim, counsel knowingly refile motion poorly in movant defense.

B. Denied.    *facts that show counselor had knowledge of a conflict →*

After the Defendant's second conviction, the only possible issue for appeal was the argument that because the first conviction was reversed due to the prosecutor's closing argument, a conflict was created and a different prosecutor should have been assigned to the second trial. All attempts to obtain a plea offer in the second trial were unsuccessful. I believe that this demonstrated unfairness creating a denial of due process. The Delaware Supreme Court did not agree, but it was an arguable issue and it was the Defendant's last chance on direct appeal.

Ground 4. Movant claim that his constitutional rights was violated when defense counsel never allowed movant to present witnesses that would have been an intricate part to movant defense strategy. When counsel told movant that Sherrelle Morris, did not give helpful information the action taken went totally against movant's wishes on preparing for trial. See letter dated Jan. 6, 2003, which shows in fact that movant requested for witness to be present also movant can show ineffective assistance when trial counsel file motion to present potential witness Stefan Powell, into evidence without allowing for witness to be present so that movant could confront, and or use incriminating statements which would have showed the Juror's different side or view to defense case. This is a direct violation of movant constitutional amendments that guarantee that every American citizen has the right to confront hostile witnesses and to have compulsory processes for

obtaining defense witnesses, see State's evidence also letter dated October 7, 2002.

C. Denied.

In regard to Steffon Powell, Williams testified that Powell, not Williams, delivered cocaine to Scott. Scott testified in both trials that Williams delivered the cocaine. Powell was never arrested nor could he be located in order to interview him.

In regard to Sherelle Morris, Williams told me that he was with Morris at the time of the offense and that she would testify in his defense. We located Morris and interviewed her on October 3, 2002. She did not have information helpful to Williams. See enclosed Exhibits:

Exhibit "E" - Letter to Morris

Exhibit "F" - Letter to Investigators

Exhibit "G" - Memo from Investigator

Exhibit "H" - Letter to Williams

Exhibit "I" - Subpoena for Morris (she did not appear)

Ground 5. Movant claim that it was to his disadvantage for counsel not to argue the evidence at movant's second trial when testimony was given by the State's expert witness at movant's first trial showed in fact that the evidence was picked up from the police department on February 28, 2001 and did not arrive at the medical examiner's office until March 1, 2001. The evidence could have been easily planted. When the State never showed where the evidence was over night counsel was unprepared to question State's witnesses at movant's second trial which deprive movant of impeachment opportunity.

D. Denied.

No objection was made to admission of the cocaine which was picked up by the

courier and delivered to the medical examiner the next day, because (A) the Delaware Supreme

Court has upheld Title 10, § 4331, which provides that the courier is not in the chain of custody

Demby v. State, 695 A.2d 1127 (Del. 1997) and (B) there was no evidence whatsoever of tampering

(such as any irregularities on the evidence tag or tape).

Respectfully submitted,

Sandra W. Dean, Esquire
Assistant Public Defender
Office of the Public Defender
The Sykes Building
45 The Green
Dover, DE 19901

SWORN TO AND SUBSCRIBED by me the date and year aforesaid.

Notary Public/Attorney At Law

ATTORNEY AT LAW
WITH POWER TO ACT
AS NOTARY PUBLIC
PER 29 DEL C 4325 (b) (9)

Ground TWO

FACTS

# Exhibit "A"

State Witness William Scott, testimony

FiRSt trial, Scott: A-80-A-92.

Scott - direct

1          A.    I'm successfully doing what I'm supposed

2     to do.

3          Q.    Is it time-consuming?

4          A.    Oh, yes.  Yeah.

5          Q.    Thank you.

6                MR. KRINER:  Nothing further at this

7     time.

8                THE COURT:  Ms. Dean?

9     CROSS-EXAMINATION BY MS. DEAN:

10         Q.    Good afternoon, Mr. Scott.

11         A.    How ya' doin'?

12         Q.    Mr. Scott, you described pulling over on

13    New Street by a fence.  Could you be more specific

14    about where the fence is; in other words, what

15    building it's near?

16         A.    It's a building.  It's a brick building

17    there, and it's got a black fence in front of it.  I

18    don't know if it's an apartment building or a

19    shelter or whatever it is.  It's just a brick

20    building there.

21         Q.    Are there any trees along the street?

22         A.    Some trees, yes, uh-huh.

23         Q.    Were you directly in front of the building

Scott - cross

1    or were you a little bit north or south of the

2    building?

3         A.    I was right there at the building, right

4    there in front of it.

5         Q.    Near a tree or not near a tree, the best

6    you can recall?

7         A.    I don't recall.  I don't --

8         Q.    You don't recall that?

9         A.    No.

10        Q.    Now, it was, what, about 8:30 at night?

11        A.    I don't recall what time it was.  I know

12   it was in the evening.

13        Q.    In February?

14        A.    Yes, ma'am.

15        Q.    All right.  So, would it be fair to say it

16   was dark, dark outside in general?

17        A.    I could see, I mean, what was going on.

18   I --

19        Q.    We'll get to that in a minute.  Was it

20   dark out --

21        A.    Yes.

22        Q.    -- at 8:30 in February?  Okay.

23              Now, you made some comment in your

Scott - cross

1    testimony.  I think you said the street lights were

2    on.  How close was the nearest street light?

3         A.   You got -- you got them, like, what, every

4    15, 20 feet?

5         Q.   Now, would it be correct, naturally, that

6    the street lights are up high?  Street lights are

7    higher than the roof of your car, correct?

8         A.   Right, yes, ma'am.

9         Q.   Now, if the street lights were higher than

10   your car and shining down on the roof of your car,

11   how could you see the person -- the person leaned

12   into your car was not in the light, were they?

13   Weren't they in the shadow?

14        A.   I could see.  If my window's down and the

15   person's leaning in my passenger's side window, I

16   should be able to see what they look like.

17        Q.   My question is not what you should see.

18   My question is what did you see from the street

19   light shining over your car when the person leaned

20   down into the window?

21        A.   I seen your client.

22        Q.   So, there was no shadow on the face of the

23   person who leaned in the car?

```
 1        A.    No, ma'am.

 2        Q.    No?  The roof of your car didn't make any

 3    shadow?

 4              MR. KRINER:  Objection, your Honor.  Asked

 5    and answered.

 6              MS. DEAN:  I'll withdraw it.

 7              THE COURT:  All right.  The question is

 8    withdrawn.

 9        Q.    Now, you were, of course, in the driver's

10    seat and this person approached you on the

11    passenger's side, is that correct?

12        A.    Yes, ma'am.

13        Q.    All right.  How long did this transaction

14    take, roughly?

15        A.    Two minutes.

16        Q.    Okay.  The person who sold you the

17    cocaine, how were they dressed?

18        A.    I don't recall that, ma'am.

19        Q.    But you testified that there -- I believe

20    your exact words were, "There could have been others

21    on the street."

22        A.    Yes.

23        Q.    Okay.  In fact, in response to another
```

1   question of Mr. Kriner's, you said when you came

2   back to the area, the police were looking around for

3   other things. Could you be more specific about what

4   you saw the police doing?

5       A.   I don't -- I don't -- I wasn't paying that

6   much attention. I know they were outside of the

7   car. They placed me in the vehicle, took me back to

8   the scene, and then they got out of the car and I

9   don't know what they were doing.

10      Q.   Now, when you came back to the scene and

11  you saw Mr. Williams there, correct --

12      A.   Uh-huh.

13      Q.   -- and you saw that he was in the custody

14  of the police, could you tell that?

15      A.   Yes, ma'am.

16      Q.   Okay. And, in fact, you said, "That's the

17  guy you arrested?"

18      A.   Yes, ma'am.

19      Q.   "The one you've arrested?"

20      A.   Yes, ma'am.

21      Q.   Did the police have anybody else in

22  custody that you saw on the street?

23      A.   No, I didn't see anybody else.

1        Q.    He was the only one?

2        A.    Yes, ma'am.

3        Q.    Okay.  Now, you testified about the

4    disposition of your charges through the Drug

5    Program, correct?

6        A.    Yes, ma'am.

7        Q.    Now, about those charges, would it be

8    correct that you were charged with possession of

9    cocaine?

10        A.    Yes, ma'am.

11        Q.    That's one of the charges?

12        A.    Uh-huh.

13        Q.    And they found a crack pipe in the car,

14    didn't they?

15        A.    Yes, ma'am.

16        Q.    So, you were charged with possession of

17    drug paraphernalia.

18        A.    Yes, ma'am.

19        Q.    Okay.  Is it not correct that you were

20    then charged with possession of cocaine within 300

21    feet of a park, a felony charge?

22        A.    Yes, ma'am.

23        Q.    And then would it be correct that you were

Scott - cross

1    charged with another felony, maintaining a vehicle?

2         A.    Yes.

3         Q.    So, you were charged with two felonies and

4    two misdemeanors.

5              Now, were you concerned that you could

6    lose your driver's license if you were convicted of

7    these charges?

8         A.    Yes, ma'am.

9         Q.    That was worrisome to you?  In fact, you

10   don't have a very good driving record, do you?

11             MR. KRINER:  Objection, your Honor.

12   Relevance?

13             MS. DEAN:  Your Honor, it has to do with

14   him being worried about his driver's license.

15             MR. KRINER:  May we approach?

16             THE COURT:  Yes.

17             (The following occurs at sidebar:)

18             MR. KRINER:  Your Honor, this is clearly

19   not grounds for impeachment.  She is asking about a

20   driving record.

21             MS. DEAN:  I'm not impeaching on his

22   driving record.  I'm bringing out that he was

23   worried about losing his driver's license, about the

Scott - cross

1    drug charges, and one reason is because he has a

2    terrible driving record.

3              MR. KRINER:  What relevance does a driving

4    record have to him losing his license for a drug

5    charge?

6              THE COURT:  I think you're missing the

7    point, Mr. Kriner.  I think this is reasonable on

8    cross-examination.  It indicates what level of fear

9    the defendant may have had at the time --

10             MR. KRINER:  But, your Honor --

11             THE COURT:  -- of the event.

12             MR. KRINER:  -- the point she's making,

13   your Honor, is that if he was convicted of a drug

14   charge, he'd lose his license.  It's not a DMV

15   matter.  She's getting -- she's bringing in his

16   driving record for the purposes of impeachment.

17   That's the only basis.  I mean, he was going to lose

18   his license regardless of his record for the drug

19   convictions.  I don't see what the relevance is

20   other than to improperly impeach him on his driving

21   record.  Because he has nothing else on his record

22   defense counsel is trying to impeach him based on

23   his driving record.

1              THE COURT:   All right.   I understand your

2    position, but I'm going to overrule it.   You may ask

3    the question.

4              (Whereupon, the sidebar concluded.)

5              THE COURT:   Ms. Dean, you may proceed.

6    BY MS. DEAN:

7         Q.   Now, Mr. Scott, I believe the question

8    was -- to back up a minute, you said you were

9    worried about losing your driver's license because

10   of having drugs in the car?

11        A.   I was concerned about a lot of things,

12   especially, particularly, about going to jail.

13        Q.   Oh, of course, and also about your

14   driver's license, is that correct?

15        A.   Yes, ma'am.

16        Q.   And isn't it correct that you have many

17   offenses on your driver's record which have put your

18   driving license at jeopardy?

19        A.   Yes, traffic violations.

20        Q.   Yes, okay.   Would it be correct to say you

21   had 14 points on your license?

22        A.   Had, yes.

23        Q.   Okay.   All right.   Now, then, you

1   testified that this car belonged to your

2   girlfriend?

3        A.   Yes, ma'am.

4        Q.   Were you worried that the police or the

5   State could seize the car?

6        A.   Yes, ma'am.

7        Q.   That was a big worry, wasn't it?

8        A.   Yes, ma'am.

9        Q.   Your girlfriend would have been pretty

10  upset if they took her car, wouldn't they?

11       A.   Yes.

12       Q.   Now, when you participate in the Drug

13  Program, if you do everything you're supposed to do,

14  what happens to your charges?

15       A.   They're -- the rest -- I do believe the

16  arrest stays on the record, but the charges are

17  dropped, I do believe, and then I think a maximum of

18  three years, you can go somewhere and get -- get

19  what they call an expungement and have it taken off

20  of your record, but you have to successfully do

21  the -- maintain the requirements -- you know,

22  fulfill the requirements that they ask of you.

23       Q.   I see.  All right.  So, when you complete

 1    this program, the charges will be dropped --

 2        A.   Yes, ma'am.

 3        Q.   -- correct?  All right.

 4             And there's no chance of going to jail if

 5    you complete the program?

 6        A.   No, ma'am.

 7        Q.   Okay.  And if you complete the program,

 8    you will not be on probation?

 9        A.   I'm not on probation right now.

10        Q.   No, but, I mean, when they're dropped.

11        A.   Oh, okay, I understand.

12        Q.   If they're dropped, right?

13        A.   Right.

14        Q.   And if you successfully complete the

15    program, you will not lose your driver's license, is

16    that correct?

17        A.   Yes, ma'am.

18        Q.   All right.  And nobody has made any legal

19    moves whatsoever to seize your girlfriend's car,

20    have they?

21        A.   No, ma'am.

22        Q.   No.  You haven't heard anything about

23    seizure of the car?

1          A.   No, ma'am.

2          Q.   Okay.  Where is the car?  Your girlfriend

3     have it?

4          A.   Yes, ma'am.

5          Q.   Okay.  Now, were you informed that you

6     were expected to cooperate, come to court, be

7     cooperative, so forth, with the State as part of

8     your --

9          A.   I was told that I might be subpoenaed to

10    come to appear in court for this case.

11         Q.   All right.  Okay.

12              Now, if I could just back up a little bit

13    to the night this happened when the police officer

14    drove you back to the area on New Street, were you

15    pretty upset at that point?

16         A.   Yes.

17         Q.   Did you think it would be helpful to you

18    to assist the police as best you could?

19         A.   I was in handcuffs.  I mean, I knew I was

20    going to jail.  That was my thought.  I was going to

21    jail regardless because of being caught with the

22    dope -- excuse me -- with the drugs.

23         Q.   But you didn't go to jail, did you?

Scott - cross

 1        A.    Yes, they took me right down to Dover

 2    Police Department.

 3        Q.    How long were you in jail?

 4        A.    For a period of time, maybe three, four

 5    hours.

 6        Q.    Three or four hours.

 7        A.    Yes, ma'am.

 8        Q.    Okay.  And then you were released.  Was

 9    your bond unsecured?

10        A.    Yes.

11        Q.    Did you have to pay any bail or was it

12    unsecured?

13        A.    It was unsecured.

14        Q.    Unsecured, okay.

15             MS. DEAN:  I have no other questions, your

16    Honor.

17             THE COURT:  All right.  Any redirect,

18    Mr. Kriner?

19             MR. KRINER:  Yes, your Honor.

20    REDIRECT EXAMINATION BY MR. KRINER:

21        Q.    Mr. Scott, on February 15th, how many

22    people approached your car?

23        A.    One.

Ground TWO
FACTS

# Exhibit "B"

State Witness OFFiceR James Hosfelt testimony

First trial, Hosfelt: A-124-A-131

124

1    came to the side or came out the front where I could

2    not see him.  He came out here and went back in this

3    direction to the back yard, and Officer McCleary,

4    who was also up there with me, saw the individual in

5    the back yard, but we lost track of him and were

6    unable to find him.

7         Q.   And that was the hooded gentleman?

8         A.   That was the gentleman wearing the hoody,

9    the hooded jacket.

10        Q.   Approximately how long after you observed

11   the transaction did Officer DiGirolomo arrest the

12   defendant in front of Kent Apartments?

13        A.   It's very quick.  I mean, within a matter

14   of a couple of minutes at the most.  It's just -- it

15   just happens quickly.

16        Q.   And at that time, as of that time, did the

17   defendant ever leave the front of Kent Apartments?

18        A.   No.  He had no reason to believe that, you

19   know, anybody knew he was involved in anything.

20        MR. KRINER:  I have nothing further.

21   CROSS-EXAMINATION BY MS. DEAN:

22        Q.   Good afternoon, corporal.  Is it corporal?

23        A.   Yes, ma'am.

1         Q.   Okay.  Corporal, you said you were up on

2   the second floor of Kent Apartments where you put

3   that H?

4         A.   Yes, ma'am.

5         Q.   And you described two street lights.

6   Could you tell us again where they are --

7         A.   Yes, ma'am.

8         Q.   -- approximately?

9         A.   They -- they pretty much border the lot of

10  Kent Apartments.  One would be here.  One would be

11  here.

12         Q.   Okay.  Then you said there was a light on

13  the building.

14         A.   Yes, here.

15         Q.   The one on the building, how high is it?

16  Is it over your head?

17         A.   It's -- if you were standing on the ground

18  level, yes, ma'am.

19         Q.  That's what I meant.

20         A.   Yes.  Between the first and second floors,

21  in that area.

22         Q.   So, the one on the building is between the

23  first and second floors?

126

Hosfelt - cross

1   A. Yes. Yes.

2   Q. So, would it be correct that both of these

3 street lights and the light on Kent Apartments are,

4 for example, higher than a car?

5   A. Yes.

6   Q. Okay.  Now, when you were looking out

7 there at the people that you've described, and you

8 described Mr. Williams was out there and another

9 person wearing a hooded blue jacket, were there --

10 their backs were to you, weren't they?

11   A. The gentleman with the hooded jacket,

12 yes.  I had seen Mr. Williams enough beforehand to

13 have seen his face and know what he had looked like.

14   Q. But when this car pulled up, they both had

15 their backs to you, didn't they --

16   A. Yes.

17   Q. -- at that point?

18   And you were observing through binoculars?

19   A. At that point, yes.

20   Q. The person who came out of 16 New Street,

21 did he come right out, went right and did this, and

22 went right back, or was he hanging around?

23   A. I hadn't seen him the whole evening.

127
Hosfelt - cross

1    Apparently, he came -- he was set up in the house

2    making deliveries from the house.  I hadn't seen him

3    prior to that point.

4         Q.   All right.  Now, after you observed this

5    event, you radioed the other officers that you had

6    Mr. Williams in sight.  Did you radio anybody to go

7    to the 16 New Street address and arrest anybody

8    there?

9         A.   No.

10        Q.   No?  This person in the blue hooded

11   jacket, was that someone you had seen before?

12        A.   I could not tell you, ma'am.  I didn't see

13   a face.  I don't --

14        Q.   All right.  So, you couldn't identify him

15   if he walked in here today, or could you?

16        A.   No, I could not.

17        Q.   All right.  So, you basically -- you

18   basically radioed the other officers to arrest the

19   person in sight.  The other one got away.

20        A.   Yes.

21        Q.   And you said that he went behind Kent

22   Apartments or behind 16 New Street?

23        A.   Behind the residence at 16.

Hosfelt - cross

1        Q.    All right.  Did you -- you never left your

2    location --

3        A.    No.

4        Q.    -- is that correct, so you didn't --

5        A.    No.

6        Q.    Okay.  Do you have any knowledge

7    personally what he did back there, yourself?

8        A.    No, I do not.

9        Q.    No, okay.  Now, you mentioned about your

10   observation of the car, and it would be correct,

11   then, that you could not read the tag?

12       A.    I could -- when it was parked here

13   initially doing the buy, I couldn't read the tag,

14   but as it went south, I was able to read the tag

15   through my binoculars.

16       Q.    When it was parked there during this

17   transaction, then, the rear of the car was to your

18   left, then?

19       A.    Yes.

20       Q.    To the point where you couldn't see the

21   tag?

22       A.    That's correct.

23       Q.    And how far would you say you were from

```
 1   the car, roughly?
 2        A.   I estimated about 50 feet.
 3        Q.   Okay.
 4             MS. DEAN:  No other questions.
 5             MR. KRINER:  Just one, your Honor.
 6   REDIRECT EXAMINATION BY MR. KRINER:
 7        Q.   Why did you have Officer DiGirolomo arrest
 8   the defendant as opposed to the guy in the hood?
 9        A.   Well, when we initially set up, we make a
10   plan.  You have to stick -- it's very important that
11   you stick to the plan so things fall into place.
12   It's just we have to work in pairs, unfortunately,
13   out there.  It's a safety issue.
14             I had my eye on the first subject.  If we
15   get somebody else involved, great, but that didn't
16   happen here.
17        Q.   Why did you select the defendant as
18   opposed to the guy at 16?
19        A.   Because he made the direct delivery of the
20   illegal drugs.
21        Q.   The one that you observed?
22        A.   The one that I observed.
23             MR. KRINER:  Nothing further.
```

Hosfelt - recross

1    RECROSS-EXAMINATION BY MS. DEAN:

2        Q.    Just a follow-up question on that,

3    officer.

4            When the officer came back to take

5    Mr. Williams in custody, did Mr. Williams walk away,

6    run, resist in any way?

7        A.    No, he did not.

8        Q.    Okay.  No other questions.

9            MR. KRINER:  No follow-up, your Honor.

10            THE COURT:  You may step down, officer.

11            THE WITNESS:  Thank you, sir.

12            MR. KRINER:  The State calls Officer Brian

13    Sherwood to the stand.

14            THE PROTHONOTARY:  Place your right hand

15    on the Bible and state your full name.

16            THE WITNESS:  Brian W. Sherwood.

17            Whereupon, BRIAN W. SHERWOOD was called as

18    a witness by and on behalf of the State and, having

19    been first duly sworn, was examined and testified as

20    follows:

21            MR. KRINER:  Your Honor, may we approach

22    on a scheduling matter?

23            THE COURT:  Yes, you may.

Hosfelt - recross

1              (Whereupon, a discussion is held off the
2       record.)
3              THE COURT:  All right, officer, you may
4       step down.
5              Members of the jury, we're going to take a
6       10-minute recess, okay?
7              Please take the jury out.
8                   (Jury dismissed.)
9              THE COURT:  Okay, 10-minute recess.
10             (Whereupon, a brief recess is taken.)
11             THE COURT:  Ready to begin?
12             MR. KRINER:  Yes, your Honor.
13             THE COURT:  Okay.  Before we begin, I --
14      is there any reason why the parties see any
15      difficulty in starting at 9:30 tomorrow?
16             MR. KRINER:  Your Honor, I asked the
17      medical examiner to be here at 10 tomorrow.  I plan
18      on having him as my first witness.  I can call
19      Officer Reed.  My plan is to get two witnesses in
20      today.  One is very, very short and the other one
21      shouldn't be more than a half an hour total.
22             THE COURT:  All right.  The schedule for
23      tomorrow will allow for an earlier start than

Ground TWO

FACTS

# Exhibit "C"

State Witness William Scott, testimony

Second trial, Scott: A-30-A-38.

```
 1              MR. KRINER:  I have nothing further at

 2    this time, Your Honor.

 3              THE COURT:  All right.  Ms. Dean, any

 4    cross-examination?

 5              MS. DEAN:  Yes, Your Honor.

 6                      * * * * *

 7                   CROSS-EXAMINATION

 8                      * * * * *

 9    BY MS. DEAN:

10         Q.    Good afternoon, Mr. Scott.

11         A.    Good afternoon.

12         Q.    Mr. Scott, when you pulled up on New

13    Street, are you familiar with Kent Apartments?

14         A.    Not by name.

15         Q.    Okay.  Were you near this apartment

16    building?

17         A.    I was near a brick building.

18         Q.    Were you right in front of that brick

19    building or in front of any other building?

20         A.    That was the building I was in front of,

21    the brick building.  It was maybe -- tall, two

22    story, three story building.

23         Q.    Okay.
```

Jennie L. Washington
Official Court Reporter

```
 1          A.    All I know is it was brick and had a
 2    black fence in front of it.
 3          Q.    All right.  Now, what time -- this was
 4    in February, correct?
 5          A.    Yes, ma'am.
 6          Q.    Almost two years ago, next month it will
 7    be two years?
 8          A.    Right.  Yes, ma'am.
 9          Q.    Okay.  Just roughly, what time was it?
10          A.    I don't remember, ma'am, what time it
11    was.
12          Q.    Okay.  But you testified, I think
13    Mr. Kriner asked you, you said it was dark?
14          A.    It was dark, yes.
15          Q.    Okay.  Now, you testified that there
16    were street lights in the area.  Would it be
17    correct that the street lights were higher than the
18    roof of your car?
19          A.    Were the street lights higher --
20          Q.    Higher than the roof of your car?
21          A.    Yes, ma'am.  Yes, ma'am.
22          Q.    Okay.  Would it be correct that the roof
23    of your car made a shadow, in other words, when
```

```
 1    this person leaned down, weren't they in the shadow
 2    of your car?
 3         A.    I don't understand your question.
 4         Q.    All right, let's try a different way.
 5    Did the street lights illuminate the face of the
 6    person who sold you the cocaine?
 7         A.    I could see who delivered, who gave me
 8    the cocaine; if that's what you are asking.
 9         Q.    The question was did the street lights
10    shed light?  Was there light from the street light
11    on the face of the person who sold you the cocaine?
12         A.    I was in my vehicle.  I can't remember.
13         Q.    Okay.  All right.  Now, you testified
14    that the person who sold you the cocaine leaned
15    down and leaned in at the window?
16         A.    Yes.
17         Q.    That window was down?  Okay, was the
18    passenger side window all the way down?
19         A.    It was down enough for me to see his
20    face.  Halfway.
21         Q.    So it was halfway down?
22         A.    Hm-mm.
23         Q.    So he just stood outside the passenger
```

Jennie L. Washington
Official Court Reporter

1   door; he didn't actually lean inside the car?

2        A.    He leaned on my vehicle.

3        Q.    Okay.

4        A.    Okay?  And basically stuck his head in

5   the window and asked me what I wanted.

6        Q.    Okay.  He stuck his head in the window,

7   even though it was only halfway down?

8        A.    Yes.  I could see his face.

9        Q.    Okay.  How was he dressed?

10       A.    I don't remember, ma'am.  I don't

11  remember what he had on.

12       Q.    Okay.  Did he have anything on his head?

13       A.    I don't recall.

14       Q.    You don't recall anything on his head?

15  How long -- your best estimate, how long did it

16  take from the time this person approached your car

17  until the time you received the cocaine; how long

18  did the whole thing take?

19       A.    No more than a minute or two.

20       Q.    A minute or two?

21       A.    No more than a minute or two.

22       Q.    Okay.  Now, you testified that you drove

23  away and you were stopped by the police?

Jennie L. Washington
Official Court Reporter

1          A.    Yes, ma'am.

2          Q.    Isn't that correct?

3          A.    Hm-mm.

4          Q.    And you said you were returned back to

5    the scene?

6          A.    Yes, ma'am.

7          Q.    All right.  And I believe you testified

8    that you saw Mr. Williams there, or they put him in

9    the car with you?

10         A.    Yes, ma'am.

11         Q.    Okay.  Was there anyone else besides

12   Mr. Williams who was arrested that you saw there at

13   that time?

14         A.    Not at the time, no, ma'am.

15         Q.    Okay.  Were there other people on the

16   street?

17         A.    I wasn't paying too much attention.  I'm

18   sure there were.  I wasn't, my attention was

19   directed on Mr. Williams.

20         Q.    Okay.  Was there anyone that you saw who

21   handed any cocaine to the person who sold to you?

22         A.    I don't remember.  I don't remember

23   that.

---

Jennie L. Washington
Official Court Reporter

```
 1        Q.    Okay.  So you would not be able to

 2   testify if there were three people or ten people;

 3   you don't have any idea how many people were on the

 4   street; is that correct?

 5        A.    No, ma'am.  Scott, testimony

 6        Q.    Okay.  The person who sold you the

 7   cocaine, did you hand them the twenty dollar bill

 8   before they handed you the cocaine or after?

 9        A.    Afterwards.

10        Q.    After?  So they handed you the cocaine

11   first, then you handed them the money?

12        A.    Yes, ma'am.

13        Q.    Were you under the influence of cocaine

14   that night?  Had you been using some earlier?

15        A.    Yes.

16        Q.    Okay.  What about alcohol?

17        A.    Yes.

18        Q.    So you had been using alcohol and

19   cocaine before you went to New Street?

20        A.    Yes, ma'am.

21        Q.    And in fact, you had a crack pipe in the

22   car, too, didn't you?

23        A.    Yes, ma'am.
```

Jennie L. Washington
Official Court Reporter

1          Q.    Now, Mr. Kriner asked you about the

2     charges, and is it correct that you were charged

3     with two felonies, maintaining a vehicle --

4          A.    Yes, ma'am.

5          Q.    -- possession within three hundred feet

6     of a park?

7          A.    Yes, ma'am.

8          Q.    And those are felonies, correct?

9          A.    Yes, ma'am.

10         Q.    Okay.  And then you were charged with

11    two misdemeanors, possession of cocaine?

12         A.    Yes, ma'am.

13         Q.    And possession of paraphernalia?

14         A.    Yes, ma'am, that's correct.

15         Q.    Now, at the time that you were arrested,

16    were you worried about going to jail?

17         A.    Yes, ma'am.

18         Q.    Would it be fair to say that you were

19    very worried about going to jail?

20         A.    Yes, ma'am.

21         Q.    Okay.  Did you ever go to jail?

22         A.    No, ma'am.

23         Q.    Okay, was your bail set that night?

                    Jennie L. Washington
                    Official Court Reporter

```
 1        A.     It was unsecured bond.

 2        Q.     Unsecured bail?

 3        A.     Yes, ma'am.

 4        Q.     Okay.  Were you worried about losing

 5   your driver's license?

 6        A.     Yes, ma'am.

 7        Q.     Okay.  Were you worried that the State

 8   might take your girlfriend's car?

 9        A.     Yes, ma'am.

10        Q.     Okay.  Now, you didn't go to jail, you

11   said.  Did you lose your driver's license?

12        A.     At the time they were already suspended.

13        Q.     Okay.  Did you lose your license for any

14   additional period of time because of the drug

15   charges?

16        A.     No, ma'am.

17        Q.     Okay.  Did the State ever take your

18   girlfriend's car?

19        A.     No, ma'am, they didn't.

20        Q.     She still has it?

21        A.     Yes.

22        Q.     Okay.  All right.  Now, all this result

23   occurred because you went into the Drug Court
```

Jennie L. Washington
Official Court Reporter

1    Program, you said, the Diversion Program?

2         A.    The Drug Court Diversion, yes, ma'am.

3         Q.    Okay.  And all the charges have been

4    dismissed?

5         A.    Yes, ma'am.

6         Q.    Okay.  Were you informed that it was the

7    prosecution that enabled you to go into the

8    Diversion Program, who said that you could go into

9    drug court?

10        A.    Yes, ma'am.

11        Q.    Okay.

12             MS. DEAN:  No other questions, Your

13   Honor.

14             THE COURT:  Any additional redirect?

15             MR. KRINER:  Yes, Your Honor.

16                    * * * * *

17             REDIRECT-EXAMINATION

18                    * * * * *

19   BY MR. KRINER:

20        Q.    All of your charges have been dismissed

21   at this point?

22        A.    Yes, that's correct.

23        Q.    Are you still worried about going to

                    Jennie L. Washington
                    Official Court Reporter

Ground TWO

FACTS

# Exhibit "D"

State Witness OFFiceR JamesHosfelt testimony

Second trial, Hosfelt: A-59-A-66.

```
 1        A.    Yes.

 2        Q.    -- correct?  Is there some reason you

 3   chose to arrest the man in the headband as opposed

 4   to the man in the hoody?

 5        A.    Because he made the direct sale to the

 6   individual in the car.

 7        Q.    And approximately, how long was the man

 8   with the headband arrested after you observed what

 9   you believed would be the illegal drug transaction?

10        A.    Within a few minutes.  I mean, as long

11   as it took Officers Reed and Sherwood to get

12   Mr. Scott out of his car, handcuff him, reach into

13   his car and find it in the console.  It was a

14   matter of minutes.

15              MR. KRINER:  Thank you.  I have nothing

16   further at this time, Your Honor.

17              THE COURT:  Cross-examination.

18                       * * * * *

19                   CROSS-EXAMINATION

20                       * * * * *

21   BY MS. DEAN:

22        Q.    Good afternoon, Officer.

23        A.    Good afternoon.
```

Jennie L. Washington
Official Court Reporter

```
 1         Q.    Officer, you testified that you were in
 2   a second floor window at Kent Apartments; is that
 3   correct?
 4         A.    Yes, ma'am.
 5         Q.    All right.  Were you observing from one
 6   of the windows facing New Street or one of the
 7   windows facing north?
 8         A.    It should have been the window, it was
 9   the window facing New Street.  It would be on the
10   east side of the building.
11         Q.    Okay.  And was it the window closest to
12   the corner?
13         A.    Yes, ma'am.
14         Q.    The one facing New Street?
15         A.    Yes.
16         Q.    Now, you saw Mr. Williams, you said,
17   walking up and down in front of -- walking up and
18   down on the street; correct?
19         A.    Correct.
20         Q.    Not breaking any laws, we assume, at
21   that point?
22         A.    That's correct.
23         Q.    No?  Okay.  Was he with anyone else?
```

```
 1   Did you see him walking with someone?

 2        A.    No.

 3        Q.    Okay.  Did you see any other individuals

 4   near him?  Any females?

 5        A.    No.

 6        Q.    Okay. Now, you testified that he was

 7   wearing an ear band.  Could you describe a little

 8   bit more how that covered the ears?  Did it come

 9   over the top of the head or around the back of the

10   head, exactly?  Could you explain that a little

11   more?

12        A.    It's -- I don't want to say we see

13   people wear them all the time, especially in this

14   weather.  But they come slightly across the

15   forehead down across the ears.

16        Q.    Okay.  So the band covers, not covers,

17   but goes across the forehead and across the ears?

18        A.    Usually that's how they are worn, yes,

19   ma'am.

20        Q.    Okay.  Now, you testified that you saw

21   this person go over to the car and lean into the

22   car; is that correct?

23        A.    Yes.
```

Jennie L. Washington
Official Court Reporter

```
 1          Q.    All right.  Do you have any knowledge

 2    about how they could do that if the window was only

 3    halfway down?

 4          A.    Again, it was approximation.  He leaned

 5    inside the window.  I'm not asking you what you are

 6    asking me.  He leaned inside the window, if that's

 7    what you were asking.

 8          Q.    Even if it was only halfway down?

 9          A.    If it was in fact halfway down, yes, he

10    was able to get inside the window.

11          Q.    Now you testified you heard this person

12    say, "What do you want?"

13          A.    Yes.

14          Q.    How is it you could hear what they said,

15    but you couldn't hear what Mr. Scott said,

16    if you know?

17          A.    Well, the simple fact that the defendant

18    made the statement as he was walking up to the car.

19    Once he leaned the car, their conversation didn't

20    have to be as loud and I just couldn't make it out.

21          Q.    So this wasn't said while he leaned into

22    the car?  ) Scott testified different

23          A.    No.  He said that as he was walking up
```

Jennie L. Washington
Official Court Reporter

```
 1    to the car.

 2         Q.    All right.  So you couldn't hear what

 3    Mr. Scott said?

 4         A.    No, ma'am.

 5         Q.    Okay.  Now, you didn't have -- you had

 6    binoculars, you said?

 7         A.    Yes, ma'am.

 8         Q.    But you didn't have any particular

 9    listening devices?

10         A.    No, I did not.

11         Q.    So it's your testimony that from the

12    second floor of Kent Apartments, you could hear

13    what someone was saying on the sidewalk?

14         A.    Yes, ma'am.

15         Q.    Now, you testified that this other man

16    came off the porch, the one that got away?

17         A.    Yes, ma'am.

18         Q.    All right.  Was he a black or a white

19    man?

20         A.    Appeared to be a black male.

21         Q.    Okay.  And you said that after this

22    event, that he went between Kent Apartments and the

23    blue house, he went back towards Reed Street; is
```

Jennie L. Washington
Official Court Reporter

```
 1    that what he did?

 2         A.    No.  Actually it would be Queen Street,

 3    in a westerly direction.

 4         Q.    I see.  And then he disappeared?  You

 5    said you were unable to find him?

 6         A.    Yes, ma'am.

 7         Q.    And what actions, if any, did

 8    Mr. Williams take?  What did he do?

 9         A.    At which point?

10         Q.    Immediately after Mr. Scott pulled away?

11         A.    He just remained in the area.

12         Q.    He just stood there?

13         A.    Just continued to walk around and mill

14    about, yes, ma'am.

15         Q.    The other guy took off?

16         A.    Yes.

17         Q.    All right.  You said that the window was

18    open?

19         A.    To the apartment?

20         Q.    I'm sorry, yes.  I beg your pardon, the

21    window where you were --

22         A.    Yes, ma'am.

23         Q.    -- was open?  And were there any window
```

```
 1    blinds?

 2         A.    Yes, there are.

 3         Q.    All right.  Were the window blinds up or

 4    down?

 5         A.    We put them down.  I think the term is

 6    very well -- there's an adjustable shade where you

 7    can adjust it one way or the other so you can see

 8    through it without being seen.

 9         Q.    So the blind was down?

10         A.    Yes, ma'am.

11         Q.    But open --

12         A.    Yes.            Hosfelt testimony

13         Q.    -- is that correct?  And you were

14    looking through the slats in the blinds?

15         A.    Yes, ma'am.

16         Q.    Now, at the time, did Mr. Scott hand

17    this person the money before or after the person

18    handed him the cocaine?

19         A.    It was -- the exchange is pretty much

20    give and take.  It's pretty much the same time.  I

21    mean, it's a quick transaction.  Normally,

22    normally, the seller is going to get his money

23    before he gives up his product.  From what I
```

Jennie L. Washington
Official Court Reporter

```
 1    recall, the money came and then the dope came back.

 2         Q.    Well, it was kind of hard to see, wasn't

 3    it?

 4         A.    No.

 5         Q.    Now, when the officers came back and

 6    arrested Mr. Williams --

 7         A.    Yes.

 8         Q.    -- where was Mr. Williams at that

 9    point?

10         A.    He was in the area of Kent Apartments,

11    right in front.  I mean, that general area.  His

12    exact spot, I can't recall.

13         Q.    So he had not left the area --

14         A.    No.

15         Q.    -- he was right there --

16         A.    Yes, ma'am.

17         Q.    -- on the same block?

18         A.    Yes, ma'am.

19         Q.    Okay.  Did he resist in any way?

20         A.    No, he did not.

21               MS. DEAN:  I have no other questions.

22               THE COURT:  Any redirect, Mr. Kriner?

23               MR. KRINER:  Yes, Your Honor.
```

Jennie L. Washington
Official Court Reporter

movant    Williams - direct    46

Testimony 2001 ✓

1  had clothes and everything.

2      Q.   All right.   In an empty van.

3          Were you homeless?

4      A.   Yes, ma'am.   I'm homeless.

5      Q.   How did you get money to eat?

6      A.   I went down to 7-Eleven at three o'clock

7  in the morning some nights, not every night, and got

8  food from the garbage cans, sandwiches.   Whatever

9  they had left over from the chicken place, I got

10 that.   I survived like that on the streets.

11     Q.   Now, on the evening of February the 15th,

12 did there come a point where you saw William Scott

13 in his car?

14     A.   Yes, ma'am.   I noticed William Scott

15 sitting in his car.

16         MS. DEAN:   Your Honor, could I approach

17 and set up this map, please?

18         THE COURT:   Yes, you may.

19         MS. DEAN:   Thank you.

20 BY MS. DEAN:

21     Q.   Mr. Williams, if you could just look at

22 that map, you see Kent Apartments.   Could you show

23 us where, as best you recall, William Scott had

Grand  Two  more  Facts

Williams - direct

47

*Testimony 2001.*

1    pulled over?  Just -- it's okay to stand up and

2    point to where he was.

3        A.    Well, there's a mark.

4              THE COURT:  Mr. Williams, you can stand up

5    and approach the map.

6        Q.    Just stand up and show us.

7        A.    There's a mark here.  Right here.

8        Q.    Right where that X is?

*Facts*

9        A.    Right.  It's not Kent Apartments, but it's

10   a green two-story apartment building sitting right

11   here, and William Scott was, like, parked on the

12   side of the street by -- by a small tree.  There was

13   a truck parked in the back of William Scott, and

14   there was a white car parked in front of him, and he

15   was, like, just sitting in the -- in the car with

16   his window rolled all the way down.

17       Q.    All right.  You can have a seat again.

18   Thank you.

19             Now, did you wave him or flag him over or

20   did he just pull over on his own?

21       A.    No, ma'am, I didn't.  I did not.  Never

22   seen him until I approached his vehicle.  He was

23   already sitting there in the area.  Seemed like he

*Grand - TWO ▓▓▓▓▓  Facts*

Williams - direct

48

1    had been sitting there for a while.

2    Q.    All right.    Now, if we could back up a

3    second, you say he was not exactly in front of Kent

4    Apartments, he was really in front of the house

5    nextdoor, is that correct?

6    A.    Yes, ma'am.

7    Q.    All right.    Now, what did you do?

8    A.    He act like he was sitting there waiting

9    on somebody, so I -- I walked over and asked him who

10   he was looking for.

11   Q.    All right.    And then what happened next?

12   A.    And as I was talking to him in the car, I

13   was getting ready to beg him, you know, because I

14   was -- I was doing crack cocaine at the time and I

15   was on crack and I was getting ready to ask him for

16   some money or something, but by the time I get ready

17   to ask him, a guy came up behind me and tapped me on

18   my shoulder.    I turned around.    As I turned around,

19   all I know is he -- William Scott told me that he

20   was straight and he pulled off.

21   Q.    Now, if we could back up, Mr. Williams,

22   you have a little southern accent and I want to make

23   sure we understood you correctly.

1          Your Honor, the defense calls Roland

2    Williams.

3          THE COURT:  All right.  Ms. Dean, before

4    you call Roland Williams, why don't you come to

5    sidebar for a minute real quick?

6                    *  *  *  *  *

7          (Whereupon, a discussion at sidebar

8          occurred, off the record, at the

9          conclusion of which, the following

10         occurred in open court:)

11                   *  *  *  *  *

12   Whereupon,

13              ROLAND WILLIAMS,

14   was called as a witness by and on behalf of the

15   Defendant and, having been first duly sworn, was

16   examined and testified as follows:

17                   *  *  *  *  *

18              DIRECT-EXAMINATION

19                   *  *  *  *  *

20   BY MS. DEAN:

21      Q.    Mr. Williams, could you tell us in

22   February of 2001, almost two years ago, where were

23   you living in February of 2001?

Jennie L. Washington
Official Court Reporter

```
 1          A.    At the time I was homeless.  I was

 2     living in and around New Street on the streets.

 3     But I had a van in the alley that I used to sleep

 4     in on Division Street.

 5          Q.    So you would stay in a van.  Was it your

 6     van?

 7          A.    It was an old man's van.  He let me live

 8     in there because I ain't have no place to live.

 9          Q.    All right.  So that was on Division

10     Street in Dover?

11          A.    Yes, ma'am.

12          Q.    How long had you been living in the van?

13          A.    About four or five months.

14          Q.    Okay.  How did you eat?

15               MR. KRINER:  I'm going to object.

16     Relevance.

17               THE COURT:  Overruled.  I will allow it.

18     BY MS. DEAN:

19          Q.    How did you survive?  How do you eat?

20     How do you get food?

21          A.    Sometimes I worked around the

22     neighborhood to people houses.  And then again, I

23     went to the dumpster behind the 7/11 store and got
```

1    food at night after the chicken place closed.  I

2    got sandwiches from the 7-11 when they throw them

3    away.

4         Q.    Now, if we could draw your attention to

5    the night that you were arrested in February of

6    2001, were you on New Street that night?

7         A.    Yes, I was.

8         Q.    All right.  Were you in the area of Kent

9    Apartments?

10         A.    Yes, ma'am.

11         Q.    And what were you doing there?

12         A.    I was walking around every way I could

13    walk around.

14         Q.    All right.  Were you with anyone?

15         A.    I wasn't with no one at the time.  I

16    mostly be alone by myself, unless I see someone I

17    get high with and I call them.

18         Q.    Okay.  When you say you see somebody to

19    get high with, what do you mean?

20         A.    Different people that come around the

21    neighborhood, buy crack.

22         Q.    All right.  So you mean you were using

23    cocaine at that time?

1    A.    Right.  I would ask them for a hit and

2  they would sometimes give me a hit.

3    Q.    All right.

4    A.    Sometimes they would not.

5    Q.    All right.  So, you were not with anyone

6  on New Street, just by yourself walking around?

7    A.    I seen a girl.  I was with her for a

8  minute.  Her name was Sherrell Morris.

9    Q.    Okay.

10    A.    I saw her come around the corner to buy

11  some crack.

12    Q.    All right.  Now, was there a time when

13  you saw Mr. William Scott on New Street?

14    A.    Yes, ma'am.

15    Q.    All right.  Could you just tell the jury

16  what you saw Mr. Scott do, if anything?

17    A.    I was walking in and around New Street,

18  as I usually walk around looking for a friend or

19  something to come by and give me a piece of crack

20  because I was on drugs.  I saw William Scott as I

21  was walking past the sidewalk.  I saw him sitting

22  by the tree in his car with his window down.  So I

23  walked over to William Scott, and I asked him who

1    he was looking for.  And as I bent down into the

2    car, a guy came up behind me named Stefan Powell,

3    patted him on the shoulder and as I turned around,

4    I guess he must have sold William Scott some drugs.

5              But when I turned back around, William

6    Scott told me that he was straight, and I was

7    getting ready to ask him for some money, or a hit

8    or something, and he pulled off and left.

9              Next thing I know, the police seen me

10   around the corner, about maybe ten to fifteen

11   minutes later.  You know, this girl, Sherrell came

12   around the corner.  She bought a dime piece of

13   crack, I asked her for a hit.  I gave her a dollar

14   and a sandwich that I had that that lady had give

15   me for doing her yard earlier that day.

16             But we walked away, we was walking away

17   and the police saw us around the corner and we both

18   looked back and the police seemed to pass us, went

19   down to Reed Street, pulled in, turned around, came

20   back, pulled up on the curb past Kent Apartments

21   and called me over to the car.  Asked me did I have

22   any drugs or any money.  So I told them no, I

23   didn't have nothing.

Jennie L. Washington
Official Court Reporter

53

1    Q.    All right.  Now, if we could just back

2    up a little bit.  After this man tapped you on the

3    shoulder, did you know his name at the time?

4    A.    Yes, I know his mother.  I know his

5    whole family.

6    Q.    All right.  And you say that you turned

7    around and then Scott said, "I'm straight?"

8    A.    Right.  It was so quick, I was getting

9    ready to beg him for some money or crack or

10   whatever he bought, but he said he was straight.

11   Q.    What did you take that to mean?

12   A.    That he had already got some cocaine

13   because I was looking for somebody to call for him.

14   At that time, the guy came up behind me and tapped

15   me on my shoulder, I turned back around and looked

16   at him.  He was straight, he was cracking up.  This

17   Scott, it happened so quick and he pulled off.

18   Q.    Okay.  Did you see where Stefan Powell

19   went after that?

20   A.    He was standing in front of the

21   building, about five or six guys standing in front

22   of the building with dope.

23   Q.    All right.  So there were people --

Jennie L. Washington
Official Court Reporter

1      A.    Stefan just ran to the car real quick,

2    whatever, before I could call the other guy to come

3    over to the car.

4      Q.    Okay.  Now, as far as where it was,

5    earlier in the case, we had a drawing with an X on

6    it where Officer Hosfelt said that was where

7    Mr. Scott was by the tree.  Was that correct, is

8    that where he was?

9      A.    It was by the tree.

10     Q.    By the tree?

11     A.    Where Hosfelt testified.

12     Q.    Okay.  So when Mr. Scott said he was in

13   front of Kent Apartments, that was wrong?

14     A.    That was wrong.  William Scott said I

15   waved him down and he pulled over in front of Kent

16   Apartments.

17     Q.    So he was in front of the tree like --

18     A.    He was already sitting in his car, just

19   sitting there --

20     Q.    Okay.

21     A.    -- when I was walking past.

22     Q.    All right.  Now, Mr. Williams, just to

23   get this completely straight here, on that night in

Jennie L. Washington
Official Court Reporter

1    February of 2001, did you hand William Scott any

2    cocaine?

3        A.    No, ma'am.  I had no cocaine.  I had no

4    money.  I had no nothing.

5            MS. DEAN:  No further questions, Your

6    Honor.

7            MR. KRINER:  May the State

8    cross-examine, Your Honor?

9            THE COURT:  Yes, sir, you may

10   cross-examine.

11                    *  *  *  *  *

12                CROSS-EXAMINATION

13                    *  *  *  *  *

14   BY MR. KRINER:

15       Q.    Sir, you were out on New Street on

16   February 15th, 2001, around 8:30 p.m., correct?

17       A.    Yes, sir, I was.

18       Q.    Where were you going?

19       A.    Where was I going?  I didn't have

20   nowhere to go.  That's all I do all night, is walk

21   on the streets back and forth.

22       Q.    So you were walking back and forth on

23   the sidewalk?

Jennie L. Washington
Official Court Reporter

1    examined and testified as follows:

2                           * * * * *

3                    DIRECT-EXAMINATION

4                           * * * * *

5    BY ~~MR. DEAN~~:

6        Q.    Good morning, Mr. Truitt.

7        A.    Good morning.

8        Q.    Mr. Truitt, could you tell us where

9    you are employed?

10       A.    I'm currently an investigator in your

11   office.

12       Q.    And how long have you been employed as

13   an investigator there?

14       A.    Approximately three years.

15       Q.    And prior to working there, what

16   experience, if any, do you have in investigating

17   crime scenes?

18       A.    I'm a retired Delaware State Police

19   Officer.  I served twenty years with that

20   department.  My first ten years was as a patrol

21   officer.  My last ten years was investigating

22   homicide, rapes, robberies.

23       Q.    And, Mr. Truitt, in connection with this

---

Jennie L. Washington
Official Court Reporter

1    case, did you have occasion to go to a location on

2    New Street, known as Kent Apartments?

3         A.    Yes, I did.

4              MS. DEAN:  Your Honor, may I approach

5    the witness with these exhibits which have been

6    marked for identification as A, B, C and D?

7              THE COURT:  Yes, you may.

8              MR. KRINER:  Your Honor, may I just take

9    a real quick look at those, please?

10             THE COURT:  All right.

11             (Pause.)

12   BY MS. DEAN:

13        Q.    Could you take a look at those four

14   photographs and tell us, first of all, who took

15   them?

16        A.    These photographs are of Kent

17   Apartments, and I obtained the photographs myself.

18        Q.    And when did you take the pictures?

19        A.    These were taken last Friday, the 17th,

20   at approximately 1 o'clock in the afternoon.

21        Q.    So they were taken in the daytime?

22        A.    Yes, they are.

23        Q.    Okay.  And I'm sorry, what do they show?

```
 1          A.      They depict Kent Apartments.  The east
 2   side and the north side.
 3          Q.      All right.
 4               MS. DEAN:  Your Honor, we would like to
 5   move that these photographs be admitted into
 6   evidence.
 7               MR. KRINER:  No objection, Your Honor.
 8               THE COURT:  All right.  They shall be
 9   admitted.  Is there four of them?
10               MS. DEAN:  Four photographs
11   for identification, A, B, C and D.
12               THE COURT:  Do you want them introduced
13   as a group or individually?
14               MS. DEAN:  I think they have been marked
15   individually, Your Honor, so probably individually.
16               THE COURT:  All right.  We will mark
17   them as Exhibits 1 through 4.
18   BY MS. DEAN:
19          Q.      Mr. Truitt, did you have occasion on
20   another date to do another investigation at Kent
21   Apartments?
22          A.      Yes, I did.  On September 10th of last
23   year, I had occasion to be in apartment 202, and at
```

Jennie L. Washington
Official Court Reporter

1    that time, myself and the other investigator,

2    Mr. Bates, were given the privilege of examining

3    the windows in that apartment.

4        Q.    All right.  Is that apartment on the

5    first or second floor?

6        A.    That apartment is on the second floor.

7        Q.    And which way do you the windows face?

8        A.    There's one window facing east towards

9    New Street and three facing north.

10        Q.    All right.  And did you have any

11    occasion to make any diagrams or drawings of the

12    apartment building at that time?

13        A.    Not inside the apartment but on the

14    outside.  Later on we were there and did a diagram

15    and took measurements.

16        Q.    Okay.

17            MS. DEAN:  Your Honor, could I have a

18    moment to show this to Mr. Kriner?

19            THE COURT:  Yes, ma'am.

20            (Pause.)

21            MS. DEAN:  Your Honor, may I approach

22    the witness?

23            THE COURT:  Yes, you may.

Jennie L. Washington
Official Court Reporter

1    BY MS. DEAN:

2        Q.    Mr. Truitt, could you explain to the

3    jury what that is that you are holding there that

4    has been marked as Exhibit E?

5        A.    Okay, this is --

6              MR. KRINER:  Your Honor, I just ask that

7    he not show it to the jury at this point.

8    BY MS. DEAN:

9        Q.    Just explain it to us at this point.

10       A.    This is a drawing I made of Kent

11   Apartments, and with the measurements from Kent

12   Apartments to a tree that's located on New Street.

13       Q.    All right.  And is that tree in front of

14   a house?

15       A.    Yes, it is.

16       Q.    Do you recall the color of the house?

17       A.    The color of that house was blue.

18       Q.    All right.  Now, the drawing depicts

19   some measurements you took.  Did you take the

20   measurements yourself?

21       A.    Yes, I did, being assisted by

22   Investigator Bates.

23       Q.    All right.  And do you notice on the

Jennie L. Washington
Official Court Reporter

1    drawing one of the windows has an X?

2        A.    Yes, I do.

3        Q.    All right.  That is the window that

4    Officer Hosfelt says he was observing.

5    Can you tell us approximately how far that window

6    is from the tree?

7        A.    That window is approximately a hundred

8    feet.

9        Q.    How far would that be in yards, roughly?

10        A.    33, 34 yards.

11        Q.    About 33, 34 yards?

12            MS. DEAN:  Your Honor, we'd like to move

13    that this chart be introduced into evidence.

14            MR. KRINER:  Your Honor, may I do brief

15    voir dire, please?

16            THE COURT:  Yes, sir.

17                * * * * *

18                VOIR DIRE

19                * * * * *

20    BY MR. KRINER:

21        Q.    Good morning, Mr. Truitt.

22        A.    Good morning, sir.

23        Q.    Mr. Truitt, there are some measurements

1    contained on that diagram which I have a copy of.

2    Did you actually take those measurements yourself

3    personally?

4        A.    Yes, I did, sir.

5        Q.    So you can testify personally that you

6    measured those distances?

7        A.    Yes, sir.

8            MR. KRINER:  Okay, thank you.  I have no

9    objection.

10            THE COURT:  All right.  It may be

11    admitted as Defendant's Exhibit 5.

12            MS. DEAN:  Your Honor, at this time,

13    we'd like to have permission to pass the

14    photographs and the drawing around to the jurors so

15    that they could view those at this time; just pass

16    them from one to the other for a couple of minutes,

17    if they could?

18            THE COURT:  So you want them published?

19            MS. DEAN:  Yes, Your Honor.

20            THE COURT:  Any objection?

21            MR. KRINER:  No, Your Honor.

22            THE COURT:  All right.  You may

23    published them.  And for ease and efficiency,

1    ladies and gentlemen of the jury, when you look at

2    the photographs, as you look through one of them

3    just pass it to the next juror.  That way we can

4    move it a little quicker.

5                    * * * * *

6              (Whereupon, the exhibits were published.

7              to the jury.)

8                    * * * * *

9    BY MS. DEAN:

10       Q.    Mr. Truitt, in regard to the second

11   floor corner window facing New Street, the one with

12   the X on it, did you have occasion to investigate

13   the view from that window?

14       A.    Yes, I did.

15       Q.    And would you describe to us what you

16   could see from that window?

17       A.    From that window, in order to be able to

18   see the tree and the street, you would have to look

19   out the window like a side view with your head

20   locking at an angle.  That would not permit the

21   blue house to be, in its entirety, to be visible.

22   But you could see portions of the crime scene.

23       Q.    All right.  So, in other words, you have

Jennie L. Washington
Official Court Reporter

1    A.    Yes.  As I said before, you could see

2    the tree from that location, but the only thing I

3    was stating is it would obscure your vision in

4    seeing the whole plane of view.

5    Q.    Got you.  But my question would be now,

6    if you could see the tree -- I think your testimony

7    was that you could see the tree with the window

8    down in the apartment?

9    A.    That's correct.

10    Q.    But it was difficult?

11    A.    Yes, it was.

12    Q.    So if the window is up and you are

13    looking at where the drug deal actually occurred,

14    which was at the sidewalk -- actually, I'm sorry,

15    at the curb, that would be significantly easier,

16    wouldn't it?

17    A.    Yes, it would.

18        MR. KRINER:  Thank you.  I have nothing

19    further.

20        THE COURT:  Ms. Dean, any redirect?

21        MR. KRINER:  Yes, Your Honor.

22              *  *  *  *  *

23          REDIRECT-EXAMINATION

Jennie L. Washington
Official Court Reporter

```
 1                      *  *  *  *  *

 2    BY MS. DEAN:

 3        Q.      Mr. Truitt, in regard to observing or

 4    investigating this scene at the time of the crime

 5    versus now, I'd like to ask a couple questions.

 6        A.      Okay.

 7        Q.      Did you see any evidence that the Kent

 8    Apartment building had moved?

 9        A.      No, ma'am.

10        Q.      They weren't doing any construction?

11        A.      No, ma'am.

12        Q.      Tearing anything down?

13        A.      No.

14        Q.      Any evidence that the windows had been

15    moved?

16        A.      No.

17        Q.      How is this tree, if possible, can you

18    estimate how old is this tree?  Is it a big tree,

19    small tree?

20        A.      It's not a large tree.  It's probably

21    twenty feet high, at the most.

22        Q.      So was there any evidence that you could

23    see that it was a different tree?
```

1    measurements or estimates?

2        A.    No.    They were actual measurements.

3        Q.    Okay.    All right.    So then your

4    testimony was that the window facing north was on

5    your drawing 99.34 feet from the tree?

6        A.    Yes, ma'am.

7        Q.    All right.    Now, when you said that you

8    were estimating that the window that Officer

9    Hosfelt was in was a hundred feet, you were adding

10   about a foot or two to go around the corner to that

11   window; is that correct?

12       A.    That's correct, yes, ma'am.

13       Q.    So that part of your testimony, that was

14   an estimate, that two feet?

15       A.    Yes.    Yes, it was.

16       Q.    All right.    Now, if the window were open

17   versus the window closed, would you have to lean

18   out to get a better view?

19       A.    If I was conducting surveillance, I

20   would have to lean out the window to get a better

21   view.

22       Q.    All right.

23       A.    Yes.

Jennie L. Washington
Official Court Reporter

1    Q.    So if you are standing inside and you do

2    not lean out, the view would be the same whether

3    the window was opened or closed?

4    A.    That's correct.

5    Q.    All right.  Now, in regard to daytime

6    versus nighttime, just in general in your

7    experience of investigating, is the view better in

8    the daytime or at nighttime?

9    A.    Well, the review is always better in the

10   daytime, unless you've got technical equipment to

11   see during the nighttime, night vision or something

12   like that.

13            MS. DEAN:   Okay.  No other questions,

14   Your Honor.

15                 *  *  *  *  *

16              RECROSS-EXAMINATION

17                 *  *  *  *  *

18   BY MR. KRINER:

19   Q.    Mr. Truitt, I don't want to beat a dead

20   horse, but just so we are clear with the window up,

21   if you were doing surveillance, based on your

22   experience as a State Trooper, would you have been

23   able to see the activity out on the curb in front

Jennie L. Washington
Official Court Reporter

1    came over to the car, leaned down and said:  Who

2    are you looking for, or who do you want?  Same

3    thing, and at that point, Mr. Powell tapped him on

4    the shoulder, he stepped back and Mr. Powell handed

5    Scott the cocaine.  Now, did anybody actually lean

6    inside the car?  Probably not, since the window was

7    only halfway down.

8              Use your common sense.  You try to stick

9    your head in a window that's only halfway down?

10   Maybe if you have a small head, but it's not likely

11   that anybody actually leaned inside the car, but

12   just outside the passenger window.

13             Now, remember that it was dark, and that

14   is important.  There has been some testimony about

15   street lights.  We don't know exactly where they

16   were.  We know that they were, of course, high, as

17   street lights are, and that the people around this

18   car as they leaned over, their face had to be, just

19   use your common sense, had to be in a shadow.

20             Now, importantly, when I asked Mr. Scott

21   how the person was dressed, he said he didn't know.

22   And I said:  Was the seller wearing anything on his

23   head?  And he said no.  And we believe that that is

Jennie L. Washington
Official Court Reporter

*defense Clasing arguements 2003*

1   very important because it shows that he really did

2   not have any power of accurate observation here.

3   There has been undisputed testimony that

4   Mr. Williams had on a band that covered part of his

5   forehead and his ears, so he clearly had something

6   significant on his head.

7           And there was some testimony that Stefan

8   Powell had on a hood, a jacket with a hood.  He

9   may have pushed the hood back, maybe not, we

10  don't know that, that's not in evidence.  But

11  you are allowed to use your common sense to figure

12  out what might have happened.  But the important

13  thing about that is that Mr. Scott was not able to

14  testify that did anybody have anything on their

15  head.  So that goes to the accuracy of his

16  observation.

17          Also, the State has given the opinion

18  that Mr. Scott and Sergeant Hosfelt testified

19  exactly the same.  Some of their testimony was the

20  same, but not all of it.  Mr. Scott testified that

21  he was, in fact, in front of the Kent Apartments;

22  and Sergeant Hosfelt testified that he was where

23  that X is on the chart that you had in front of the

Jennie L. Washington
Official Court Reporter

*(handwritten annotations in margins:)*
Shows that defense Counsel didn't object to testimony doing trial
These facts knew of the inconsistant witnesses and the State
Found Two
Found — Facts defense Closing argument 2003
to the Jury

1    tree.

2            So why did Mr. Scott identify

3    Mr. Williams?  You can ask yourself.  Well, when he

4    was arrested with the drugs in his car, he

5    testified that he was very upset.  He was afraid of

6    going to jail.  He was afraid of losing his

7    driver's license.  He was afraid the State may take

8    his girlfriend's car.

9            And then they took him back to the

10    scene, and what a relief it must have been to see

11    that they had somebody handcuffed on the street.

12    And so that was the guy, the only one standing

13    there in handcuffs.  And we would suggest to you

14    that it was just highly likely that he was

15    extremely relieved: My God, they got the guy.  You

16    know, maybe I'm going to get off the hook a little

17    bit here; and in fact, that is exactly what

18    happened later.

19            The police put Mr. Scott and Mr. William

20    in the back seat of the same police car, they

21    testified, and so from there, riding back to the

22    police station, Mr. Scott had a further opportunity

23    to look at Mr. Williams, and that no doubt firmed

Grand Two
defense

1    up the identification in his mind.  In other words,

2    we would suggest to you that once a person makes an

3    identification, they become more and more convinced

4    all along and just suddenly do not change their

5    mind.

6              It's important to remember that

7    Mr. Scott never had an opportunity to see Stefan

8    Powell.  Never had any opportunity to say which of

9    these guys sold you the cocaine, because Powell had

10   hightailed it out of there and was quickly gone.

11             Now, Mr. Scott had a incentive to follow

12   through, to cooperate, which he did, with his

13   initial identification; and in fact, the

14   prosecution, the State allowed him to enter the

15   Drug Diversion Program.  The charges were

16   eventually dismissed after he completed that.  He

17   didn't go to jail; didn't lose his driver's

18   license; the girlfriend's car was safe.

19             Now, let's look at the testimony of

20   Sergeant Hosfelt.  The important thing about

21   Sergeant Hosfelt's testimony is to ask yourself how

22   good could the view be?  Now, he testified that he

23   thought he was about fifty feet away, but as it

1    turns out, it was, if you look at that diagram, at

2    least 99 feet.  And Mr. Truitt testified he

3    estimated you could add on another couple of feet

4    from going around the corner over to the window.

5              Now, the State pointed out that the

6    transaction took place at the curb and not actually

7    at the tree.  So that could add another couple of

8    feet; we don't know exactly.  But it can be safely

9    said that Sergeant Hosfelt, in his window, was at

10   least 99 feet away from where this occurred.

11             Just for those of us who are a little

12   bit challenged for distance, I want to point out

13   that 99 feet is 33 yards, and if you were in the

14   end zone of a football field, that would be past

15   the 25 yard line.  You can just picture that, how

16   far away that is.  That might give you some idea,

17   if any of you have stood on a football field.

18             Now, it was dark.  Mr. Truitt testified

19   that it was not impossible to see that spot.  You

20   could see that spot, but you had to lean to the

21   side.  You had to look sideways out.  In other

22   words, it wasn't right out in front of the window,

23   it was down the street.  You had to look to the

```
 1              Think about the actions of the two
 2    people after this happened.  Which one ran and
 3    which one stayed right there?  Stefan Powell ran,
 4    never apprehended, couldn't find him.  Mr. Williams
 5    stayed right there, walked close by the Kent
 6    Apartments.  The officer drove by him in a marked
 7    police car, turned around and came back, and he was
 8    just standing there.  Which action shows a person
 9    who is conscious of being guilty of something?  And
10    you are allowed to consider the actions of the
11    people to determine in your own mind what you think
12    shows the consciousness of guilt.
13              The identification in this case is
14    simply faulty for the reasons that I have given
15    you.  The wrong man has been arrested and charged.
16    There has been an injustice done here; and we ask
17    you to consider all the evidence carefully, to
18    right a wrong, to correct an injustice, to find him
19    not guilty.
20              THE COURT:  Thank you, Ms. Dean. defense
21              Mr. Kriner, any rebuttal?
22              MR. KRINER:  Very briefly, Your Honor.
23                        *  *  *  *  *
```

Jennie L. Washington
Official Court Reporter





Ground - Three



## PUBLIC DEFENDER OF THE STATE OF DELAWARE
### THE SYKES BUILDING
### 45 THE GREEN
### DOVER, DELAWARE 19901

LAWRENCE M. SULLIVAN
PUBLIC DEFENDER

SANDRA DEAN
ASSISTANT PUBLIC DEFENDER

ANGELO FALASCA
CHIEF DEPUTY

TELEPHONE
(302) 739-4476

September 19, 2002

Sojourner's Place
Attn: Sherelle Morris
2901 N.E. Blvd
Wilmington, DE  19802

RE:  State v. Roland Williams

Dear Ms. Morris:

I represent Roland Williams, who was arrested on New Street in February 2001. We believe that you may have been talking to him shortly before the Police arrived, and you may have information which could be helpful to his defense.

I want to stress that you are not accused or even suspected of any crime or wrongdoing whatsoever. Please call me at 739-4476, ext. 206 between 8:00 and 8:30 a.m. on any weekday morning, or write to tell me how I can contact you; any conversation with me will be strictly confidential.

Very truly yours,

Sandra W. Dean

SANDRA W. DEAN, ESQUIRE
Assistant Public Defender

SWD/msc

Exhibit "E"

E-1

# PUBLIC DEFENDER OF THE STATE OF DELAWARE
## THE SYKES BUILDING
### 45 THE GREEN
### DOVER, DELAWARE 19901

LAWRENCE M. SULLIVAN
PUBLIC DEFENDER

ANGELO FALASCA
CHIEF DEPUTY

SANDRA DEAN
ASSISTANT PUBLIC DEFENDER

TELEPHONE
(302) 739-4476

September 27, 2002

Ray Scott, Investigator
William Prettyman, Investigator
Office of the Public Defender
Wilmington, DE 19801

RE: State v. Roland Williams ID# 0102014259

Dear Ray and Bill:

I would appreciate your interview of a possible witness, Sherelle Morris, who is living at Sojourner's Place, 2901 N.E. Boulevard, Wilmington.

On February 15, 2001 around 8:30 p.m. Ms. Morris was on New Street in Dover near Kent Apartments talking to Roland Williams, whom she knew by his street name, "Florida Boy". Photos of him are enclosed.

A black male driving a dark colored 4-door Hyundai Electra pulled up at the curb and another black male sold him cocaine. Police say it was Williams; Williams says it was a younger man, Steffone Powell, who was dealing from a blue house next door to Kent Apartments. Within a few minutes, Powell fled and Williams was arrested.

Does Ms. Morris remember this incident:? Who sold the cocaine to the man in the car? If her testimony would help Mr. Williams, please ask her to keep our office informed of any changes in address. Tell her that if she is a witness, we will arrange her transportation for trial and lodging if necessary. Thank you for your help!

Very truly yours,

*Sandra W. Dean*

SANDRA W. DEAN, ESQUIRE
Assistant Public Defender

SWD/msc

enc.

Exhibit "F"

| | |
|---|---|
| To: | Sandra W. Dean@Kent@Pub_Defender |
| From: | Raymond N. Scott@Carvel@Pub_Defender |
| Certify: | N |
| Priority: | Normal |
| Subject: | Roland Williams DUC # 0102014259 |
| Date: | Friday, October 4, 2002 at 8:54:47 am EDT |
| Attached: | None |

Sandra,

On 10/3/02 at 10:30 AM I went to Sojourner's Place and spoke to Sherelle Morris. She identified the photos you sent me as Roland Williams. Relative to the night of his arrest, Morris was walking down the street when she saw the police talking to Williams. She just kept walking. She was not with Williams before the police arrival, nor did she have a conversation with Williams that night. She did not see what happened before the police arrived.                                                She did receive the letters you sent, but had no explanation for not responding to them.

Raymond N. Scott

via HappyMail!

CONFIDENTIALITY NOTICE

THIS ELECTRONIC MAIL TRANSMISSION IS PRIVILEGED AND CONFIDENTIAL AND IS INTENDED ONLY FOR THE REVIEW OF THE PARTY TO WHOM IT IS ADDRESSED.  IF YOU HAVE RECEIVED THIS TRANSMISSION IN ERROR, PLEASE IMMEDIATELY RETURN IT TO THE SENDER.  UNINTENDED TRANSMISSION SHALL NOT CONSTITUTE WAIVER OF THE ATTORNEY-CLIENT OR ANY OTHER PRIVILEGE.

CONFIDENTIALITY NOTICE

THIS ELECTRONIC MAIL TRANSMISSION IS PRIVILEGED AND CONFIDENTIAL AND IS

Write to
Δ

Exhibit "6"

E-3



## PUBLIC DEFENDER OF THE STATE OF DELAWARE
### THE SYKES BUILDING
### 45 THE GREEN
### DOVER, DELAWARE 19901

**LAWRENCE M. SULLIVAN**
**PUBLIC DEFENDER**

**SANDRA DEAN**
**ASSISTANT PUBLIC DEFENDER**

**ANGELO FALASCA**
**CHIEF DEPUTY**

**TELEPHONE**
**(302) 739-4476**

October 7, 2002

Roland Williams
SBI# 00454319
Sussex Correctional Institution
RT 113
Georgetown, DE 19947

Dear Mr. Williams:

On October 3, 2002, Sherrelle Morris was interviewed at her residence in Wilmington. She remembers speaking to you on the street and seeing police arrive, however she did not see the drug transaction at all and has no knowledge concerning Scott or who sold him cocaine.

Very truly yours,

Sandra W. Dean

SANDRA W. DEAN, ESQUIRE
Assistant Public Defender

SWD/msc

Exhibit "H"

E-4

# SUBPOENA
## CRIMINAL CHARGES

## IN THE SUPERIOR COURT OF THE STATE OF DELAWARE
## IN AND FOR KENT COUNTY

You,   Sherelle Morris
       Soujourner's Place
       2901 N.E. Boulevard
       Wilmington, DE 19801

*Jean Cushing, counsela*
*11:30 AM   1-14-03*
*K. Kott*

are hereby commanded by the SUPERIOR COURT OF THE STATE OF DELAWARE to

appear for the Trial of

### STATE OF DELAWARE v. ROLAND WILLIAMS

at the Courthouse, 38 The Green, Dover, Delaware.

TIME:  Tuesday, January 21, 2003 at 9:00 a.m.

You will appear before the Superior Court to testify for the Defendant.

You must appear regardless of other business or personal commitments.  If you fail to appear, a capias will be issued for your immediate arrest on a contempt of Court charge.

If you have any questions, call Sandra W. Dean, Esquire at (302) 739-4476 ext. 206.

### BRING THIS SUBPOENA WITH YOU!

Witness the Judges, Superior Court, at

*Zin M. Blauman*

Prothonotary

Sandra W. Dean, Assistant Public Defender

| ID No. | Issue Date | CRA Nos. | Sheriff File No. | Deputy |
|--------|-----------|----------|------------------|--------|
| 0102014259 | 01/08/03 | IK 01-03-0053 | | ; |

*Exhibit "I"*

E-5

```
 1    Courtroom No. 1
      January 23, 2003
 2    10:55 o'clock a.m.

 3                        PROCEEDINGS

 4                    *  *  *  *  *

 5            THE COURT:  Ms. Dean?

 6            MS. DEAN:  Your Honor, I wanted to ask

 7    something to save some time perhaps.  As the Court

 8    may recall in the last trial, after Mr. Williams

 9    testifies, we would like to introduce that this

10    person named Stefan Powell had been previously

11    observed in some drug activity on the -- about a

12    block away from the scene on another occasion by

13    Officer Berna.  And previously we introduced the

14    police report into evidence, an one page police

15    report of Officer Berna.

16            We issued a subpoena for Officer Berna

17    to appear yesterday, and then as soon as we found

18    out that the trial would be today and not

19    yesterday, we called Officer Berna immediately to

20    let him know that; and it turned out that he had a

21    problem and could not be here today.  And I believe

22    he's spoken with Mr. Kriner about that, and he

23    faxed us a brief letter from the police
```

                    Jennie L. Washington
                    Official Court Reporter

CONCERNING Steffone Powell,

1    department -- if I could hand that up, Your

2    Honor -- saying he was not able to be here today.

3            Although he did appear yesterday and has

4    been very cooperative, but through no fault of

5    anybody, he could not be here yesterday.  So our

6    application will be at the appropriate time to

7    introduce that one page police report of

8    Officer Berna.  And I think the Court gave a

9    limiting instruction before about that police

10   report and we certainly would have no objection to

11   that again.

12           So that is the scenario as far as the

13   appearance of officer --

14           THE COURT:  Do you recall what the

15   limiting instruction was?

16           MS. DEAN:  It's in the transcript, Your

17   Honor.  Something about the jury could consider the

18   police report only for a limited purpose.  I don't

19   recall exactly, but --

20           THE COURT:  Okay.

21           MS. DEAN:  -- but whatever it was, I

22   think at this time appropriate.

23           THE COURT:  Let me ask you this, this

1    letter from the department of police signed by

2    Captain Raymond Turalia, is that pronounced

3    correct?

4           MS. DEAN:  Turalia.

5           THE COURT:  Doesn't indicate why he

6    can't be available.

7           MS. DEAN:  Could I have a moment?

8           (Pause.)

9           MS. DEAN:  He had to be out of town

10   today doing something with his son.  It was a

11   preapproved, preplanned day that he had off to do

12   something important with his child and just

13   something that he didn't feel he could change.

14          THE COURT:  All right.

15          MS. DEAN:  And I didn't think that it

16   was appropriate to try to push the issue to that

17   extent.  We would like to introduce this police

18   report into evidence as we did the last time.

19          THE COURT:  All right.

20          MS. DEAN:  And hope that we can do that.

21   I just didn't feel that it would be appropriate to

22   issue him another subpoena for today and make him

23   miss this thing with his son.

```
 1              THE COURT:  I understand.

 2              Mr. Kriner, what's the State's position

 3   on this?

 4              MR. KRINER:  Well, Your Honor, we would

 5   appreciate the opportunity to address it at the

 6   appropriate time when the defense seeks to

 7   introduce it into evidence; and until such time as

 8   they attempt to admit it, we would just like to

 9   reserve our comments.

10              THE COURT:  All right.  I think what the

11   defense is doing is alerting the Court to be aware

12   of the situation, and has outlined already to the

13   Court the fact that if they had the officer here to

14   testify about it, they would do so if they could.

15   So I will defer ruling until the appropriate time

16   when it comes up.

17              MS. DEAN:  I agree.  We haven't laid the

18   foundation until after Mr. Williams testifies.

19              THE COURT:  All right.  Thank you,

20   Ms. Dean.

21              Now, the other issues we have, one juror

22   is apparently sick, who arrived sick this morning,

23   so I need to verify what that condition is?
```

Jennie L. Washington
Official Court Reporter

Facts

Ground Four

```
 1              THE COURT:  All right.  Mr. Williams,

 2    you may step down, sir.  Thank you very much.

 3                    *  *  *  *  *

 4         (Whereupon, the witness stepped down.)

 5                    *  *  *  *  *

 6         MS. DEAN:  Your Honor, could Mr. Kriner

 7    and I approach just with a question about

 8    scheduling, first?

 9              THE COURT:  Yes, ma'am.

10                    *  *  *  *  *

11              (Whereupon, a discussion at sidebar

12              occurred, off the record, at the

13              conclusion of which, the following

14              occurred in open court:)

15                    *  *  *  *  *

16         THE COURT:  Mr. Bailiff, please take the

17    jury out.

18                    *  *  *  *  *

19              (Whereupon, the jury was escorted

20              to the jury room.)

21                    *  *  *  *  *

22                       MOTION

23                    *  *  *  *  *
```

Jennie L. Washington
Official Court Reporter

CONCERNING Steffone Powell

1          MS. DEAN:  Your Honor, at this time, I'd

2     like to ask the Court's permission to introduce

3     into evidence a one page police report of Officer

4     Nicholas Berna of the Dover Police Department.  It

5     indicates that on August 4th, 2000, about six

6     months before this event, that he arrested Stefan

7     Powell at 130 New Street, about a block from this

8     location.  And the police report, which is just one

9     page, indicates that Officer Berna believed that

10    Stefan Powell was receiving small amounts of

11    marijuana and crack cocaine and was selling them.

12          I do not intend to make any -- all I

13    want to do is introduce it into evidence, and then

14    in closing argument I will refer to it briefly,

15    just what it says.  Officer Berna as we noted

16    earlier was subpoenaed for yesterday.  He appeared

17    yesterday, but we were not in trial yesterday, and

18    he was unable to be here today.

19          THE COURT:  Let me ask you this, before

20    Mr. Kriner gets up, is it your proposal that you

21    would simply just have this document come into

22    evidence with all the other matters set forth on

23    the documents with the substance to be redacted,

1    what you just said?

2             MS. DEAN:  I don't think there's

3    anything to redact, Your Honor.  It's just a one

4    page police report.  It's the same one that was in

5    evidence before.

6             THE COURT:  I don't know if there was

7    something else on the report.

8             MS. DEAN:  No.  Just Stefan Powell, they

9    arrested him and it tells what happened that day.

10   We are not alleging that he was convicted or that

11   anything else happened; just for the purposes of

12   showing that he was out there on New Street.

13            THE COURT:  Okay, all right.

14   Mr. Kriner, the State's position on this?

15            MR. KRINER:  Your Honor, this may be

16   futile.  The State's basically going to lodge an

17   objection that's the same objection that it did in

18   the first trial.  Relevancy is the main objection.

19   We have a person who is arrested six months prior

20   to this incident, several blocks away, with a small

21   amount of cocaine and marijuana in his pocket.  And

22   the State can't see possibly what the relevance is

23   to what happened on February 15th, 2001.

1          I mean, the relevancy, the standard is

2    that it has to tend to prove a fact at issue in the

3    case.  And how does that fact, or those facts --

4    and they are not even facts, they are assertions by

5    Officer Berna -- how do those facts tend to prove

6    that Stefan Powell was selling dope on New Street

7    on February 15th, 2001?

8          The defense counsel, understandably,

9    maybe some things happened in the first trial that

10   they weren't aware of and maybe couldn't get Stefan

11   Powell, but in this case, they had an investigator

12   go out there and look at the Kent Apartments.  They

13   got photographs.  They could have brought Stefan

14   Powell in to say you were the guy, or did an

15   investigation.  Instead, they rely on this hearsay

16   that is completely irrelevant.

17          Interestingly, if Stefan Powell had been

18   called to the witness stand, I don't know how this

19   piece of evidence could have come in to impeach him

20   or otherwise, because it certainly wouldn't come in

21   under 404(b), because it would be trying to show

22   that because he possessed cocaine six months prior

23   to February 15th.  He had it on February 15th.  And

1    we know they couldn't do that.  It couldn't be used

2    to impeach him because the offenses, I believe,

3    were just misdemeanor offenses.

4           I don't know whether he was adjudicated.

5    It was just a juvenile offense, I believe; and I

6    don't know what the disposition was.  But my main

7    concern is the relevancy.  It's to take the jury's

8    eyes off the ball.  The defendant has taken the

9    stand, said it was Stefan Powell.  Now the jury

10   needs to either believe it was Stefan Powell or

11   not.

12          If you put in a police report that shows

13   Stefan Powell was caught with drugs six months

14   prior, they may use it for some irrelevant purpose

15   or unauthorized purpose.  The State would object to

16   its admission.

17          THE COURT:  As I understand it, this

18   person named Stefan Powell was not arrested for any

19   events that occurred on the date in question?

20          MR. KRINER:  That's correct.  And the

21   State objected the first time but it objects a

22   little more strenuously this time.  Two years has

23   passed since the first trial.  If the defense

1    counsel has investigators that are State Police

2    veterans, they could have gone out and found Stefan

3    Powell and could have put Stefan Powell on the

4    witness stand and cross-examined him, or asked him

5    direct questions about his involvement that night.

6    They didn't do that -- or maybe they did and didn't

7    like the answers they got.

8              So now they are trying to supplement

9    that which would have been proper with some piece

10   of hearsay that is not even remotely related in

11   time to this event.  If he had gotten arrested that

12   night, I think sure, they probably could've put one

13   of my officers on to say was he arrested that

14   night, or introduced the police report that night,

15   I wouldn't have objected.  But it's six months

16   different.  Just too remote.

17             MS. DEAN:  Your Honor, I can represent

18   to the Court, as an officer of the Court, that we

19   have not interviewed Stefan Powell; and the reason

20   we did not is because if I put him on the witness

21   stand, he would have a Fifth Amendment Right not to

22   incriminate himself, and that would be the end of

23   that endeavor.  And so, it would have been a futile

Jennie L. Washington
Official Court Reporter

1   exercise to try to call Stefan Powell.

2          We are not trying to impeach him or --

3   the relevance of this police report is simple; and

4   that is, it shows that Stefan Powell was accused

5   or, at an earlier time, believed to have been a

6   drug dealer on New Street.  It's just that simple;

7   and that supports Mr. Williams' testimony.  It was

8   six months time difference and one block

9   difference.  This was in the 100 block of New

10  Street on the next block, and it was about six

11  months before this event.

12          Mr. Powell, of course, was arrested on

13  that date back in August, but in February, he got

14  away.  So that, in our view, is the relevance.

15          THE COURT:  Okay.  The defense wishes to

16  introduce into evidence the police report prepared

17  by Officer Berna of the Dover Police Department,

18  which indicates that one Stefan Powell was arrested

19  on August 24th, 2000, I believe it was near New

20  Street.  I'm just sort of paraphrasing.  And I

21  understand the purpose of why the defense wants to

22  do it.

23          As a backup, in terms of my decision on

1    this, I understand the defense counsel has

2    attempted to subpoena the officer who is

3    unavailable for trial today.  I don't believe

4    that's really going to be an issue, except for the

5    fact that I find the defense has made an effort to

6    try to subpoena this individual for trial.

7    However, that doesn't go to the point, the main

8    point of the State's objection.

9            The State objects under, I guess by

10   analogy, to Rule 404(b).  But the main objection, I

11   think, is based upon the relevancy provisions of

12   the Delaware Rules of Evidence.  There we have to

13   look at Rules 401 through Rules 403.  Obviously,

14   all relevant evidence is generally admissible over

15   evidence that is inadmissible.

16           What both parties understand is that

17   relevant evidence would simply be that evidence

18   which would tend to make the existence of any fact

19   or consequence to the determination of the action

20   more probable than not, than it would be without

21   the evidence.  That generally would make the

22   evidence relevant.  It would also have to look at

23   that in conjunction with Rule 403 as to where there

1    are any other grounds to reject the evidence even

2    though it may be relevant because of prejudice,

3    confusion or could very well be a waste of time.

4            It's clear in this case that a major

5    issue in this case is going to simply be the

6    credibility of the parties involved here.  The

7    credibility of the officers who did the

8    investigation, made the arrest; and the credibility

9    of, of course, Mr. Scott as a witness to these

10   events, who in fact was a party to the crime, and

11   he was charged and convicted of a related crime in

12   conjunction therewith.  In addition, the

13   credibility of the defendant himself is now in

14   question; and the question goes to whether, in

15   fact, there was a Stefan Powell present on the

16   night in question.

17           No doubt -- the evidence I've heard thus

18   far, and the State, I don't think, is going to

19   object to this -- the fact that there was an

20   unknown individual who apparently was on the scene,

21   who apparently vacated the scene as quickly as the

22   alleged crime took place, whether that is --

23   whether that individual was Stefan Powell or not,

1    it's contested.  However, it does appear that this

2    individual, which has been discussed in front of

3    the jury, with evidence that there was some other

4    person there, that person Stefan Powell or not, is

5    something that I think is going to be a jury

6    question to be decided by the jury.

7            In light of that, I do find that there's

8    a basis to conclude that this evidence may very

9    well be relevant.  And therefore, I'm going to

10   admit it.  It's not outweighed by any prejudice or

11   confusion or redundance.  Therefore, I'm going to

12   allow the evidence to come in.

13           All right.  The objection, therefore, is

14   then overruled.

15           MS. DEAN:  Your Honor, when the jury

16   returns, I will be introducing that into evidence,

17   and then the defense will rest.

18           THE COURT:  Okay.  Now, for purposes of

19   instructing the jury, when you get done, it will

20   probably take us another twenty minutes or so back

21   in chambers to resolve any issues we may have with

22   respect to -- I guess we could do it out here --

23   the jury prayers, but I need to have copies made.

Jennie L. Washington
Official Court Reporter

1    That's going to delay the charging time somewhat.

2              I've always taken the position that I

3    don't like to charge a jury after 4 o'clock, so I

4    don't know whether we can meet that time schedule

5    or not.  If not, we will have to bring the jury

6    back tomorrow to deliberate, at least.  We maybe

7    can do closing arguments.

8              Thoughts on that?

9              MS. DEAN:  I'm ready to do closing

10   today, but if the Court wants to do it tomorrow, we

11   really don't take any position on that.

12             THE COURT:  All right.  Well, let's just

13   see how far we can get.

14             MR. KRINER:  Your Honor, I don't believe

15   there's going to be a whole lot of contention with

16   the jury instructions.

17             THE COURT:  It's just the matter of the

18   time to get the copies made and produced.

19             MR. KRINER:  As a suggestion, maybe we

20   can do closings first and that way -- and instruct

21   the jury last, and that way the Court will have

22   some additional time to get the instructions

23   together while we make our closings.

1          THE COURT:  Is that going to save us

2   anymore time or not?  I don't think it will, will

3   it?  Still have to go off the bench to get them

4   prepared.  Let's see how we go.  I will make that

5   decision when the time comes.

6          All right.  Bring the jury back.

7                * * * * *

8          (Whereupon, the jury returned to the jury

9          box, and the following proceedings were had

10         in open court:)

11               * * * * *

12         THE COURT:  Okay.  Ms. Dean?

13         MS. DEAN:  Your Honor, at this time, we

14   would like to introduce into evidence what's been

15   marked as Defense Exhibit F, which is a police

16   report of Officer Nicholas Berna of the Dover

17   Police Department.

18         THE COURT:  All right.

19         MR. KRINER:  I assume the State's

20   objection will be retained?

21         THE COURT:  Yes, those objections are

22   reserved.

23         MS. DEAN:  Okay.  Can I just give this

Jennie L. Washington
Official Court Reporter

*Facts*

 1    form and also date it.

 2              All right, Mr. Bailiff, please collect

 3    each copy of the jury instructions.

 4              (Bailiff complied.)

 5              THE COURT:  All right.  Members of the

 6    jury, we are now going to hear closing arguments of

 7    counsel.

 8              Mr. Kriner?  *2003*              *Four*

 9              MR. KRINER:  Thank you.   *Grand !* *****

10                    * * * * *                *Facts*

11              STATE'S CLOSING ARGUMENTS

12                    * * * * *

13              MR. KRINER:  Good afternoon, ladies and

14    gentlemen.  This was not a long and complicated

15    case.  I am not going to stand up here and review

16    every single piece of the evidence or the law with

17    you.  I think you all were paying attention during

18    the course of the trial; and I don't think it's

19    necessary to review everything.  However, I would

20    like to review some of the evidence, as well as

21    some of the law that the Judge just gave you in

22    this case.

23              As the Judge has instructed you, the

_____

Jennie L. Washington
Official Court Reporter

1    State must prove the defendant delivered cocaine;

2    must prove that the defendant either actually or

3    constructively transferred cocaine from one person

4    to another.  There's no requirement that he

5    received any U.S. currency for the transaction.

6    That is not an element in this case.

7            The accomplice liability, you may

8    convict a person for the conduct of another if you

9    find that the person aided another in the

10    commission of the offense, as well as the other

11    elements that the Judge instructed you on.

12            The next thing I want to discuss with

13    you is reasonable doubt.  The State must prove each

14    of the elements beyond a reasonable doubt.  It's a

15    para-standard.  It's one that the State welcomes in

16    this case.  Some of you may have come in here to

17    serve as a juror and you may have some concept of

18    what reasonable doubt is based on either what you

19    read in books, seen in the movies or on TV, and the

20    State asks that you suspend that for the time

21    being.

22            Everybody likes the movies and TV shows

23    and books about this type of stuff, and sometimes

1    you come in with some concept of what reasonable

2    doubt is. But understand it is a legal standard,

3    and the Judge just told you what it is. And

4    sometimes reasonable doubt is easier to explain

5    what it is not; and that is, it is not proof beyond

6    all doubt. It is not proof to an absolute

7    certainty, because there are very few things in

8    this world that can be proven to a certainty. It

9    is proof that leaves you firmly convinced of the

10   defendant's guilt; and it is a practical standard.

11           Your duty as jurors, and you have taken

12   an oath to serve as jurors in this case, your duty

13   is to render a verdict based on the facts and the

14   law. It is your duty to determine what the facts

15   in this case are from the evidence. The evidence

16   in this case is what came from that witness stand

17   there, and the other additional items of evidence

18   that have been formally admitted into evidence.

19   You will get those back in the jury room. You are

20   to apply those facts and evidence to the law as the

21   Judge just instructed you, and from that render

22   your decision in this case.

23           I want to talk now about what the

1    evidence shows.  Again, I'm not going to touch on

2    every piece of evidence.  This is the State's

3    summation; that is, the State will suggest what the

4    evidence showed.  You've been sitting here

5    listening to all the evidence.  The State's

6    confident you will recollect what all the evidence

7    showed.  But I do want to touch on some pieces of

8    evidence.

9              Sergeant Hosfelt, on February 15th, was

10   a spotter over in the Kent Apartments.  Now, that

11   was his sole job that night.  It was an operation.

12   Two different teams of take-down vehicles that had

13   Sergeant Hosfelt up in a window at a vantage point

14   where he could watch the activity out in front of

15   16 South New; and accordingly, that was his sole

16   job.  He was to watch.  He had binoculars up there.

17             He testified that it was a good location

18   and that is why it was selected.  He had the window

19   opened so he could hear noises and conversations

20   out on the street.  He is a veteran police officer

21   who is now in charge of the drug unit of the Dover

22   Police Department.

23             He testified that he observed the

1    defendant pacing about out in front of 16 South New

2    and Kent Apartments.  Now, you all have to consider

3    that as the first piece of evidence.  Why is the

4    defendant pacing out in front of the apartments?

5    What does that tell you?

6              The next thing Officer Hosfelt sees, he

7    sees Mr. Scott pull in, in his Elantra, pull up to

8    the curb.  He observes the defendant approach the

9    vehicle.  And another man then comes off the porch;

10   doesn't come up to the vehicle.  Prior to the man

11   coming off the porch, he heard the defendant say,

12   "What do you want?"

13             After that he sees the transaction,

14   which he testifies happens very quickly, the man

15   comes off the porch.  There's a transaction of the

16   defendant being the runner, or the go between out

17   there, and he can even, with his binoculars, he can

18   see the currency changing hands.  The defendant --

19   Hosfelt stated he was certain there was only one

20   person who approached the car and that was, turned

21   out to be the defendant.

22             He directed Corporal DiGirolomo to

23   arrest that person.  He arrested the defendant.  He

1  never lost sight of the defendant. He was the only

2  one who approached the car. Now, defense counsel

3  may argue is that he estimated fifty feet. That's

4  what he estimated it at. The defense investigator

5  testified that, well, I measured the north side

6  window to the tree at a hundred feet. Well, we are

7  really not talking about the window to the tree

8  anyway, are we? We are talking about that front

9  window to that place on the sidewalk where the deal

10  happened.

11          But, importantly, when asked, even the

12  own -- the defendant's own expert, her own

13  investigators, when asked if the window was up,

14  based on your experience, could you see what was

15  going on on the curb, he said yes. To his credit,

16  he got up there and he said: Yeah, I could see.

17  So it doesn't matter how many feet it is.

18          Sergeant Hosfelt said he could see what

19  was going on down there. He had binoculars, in

20  addition to that where the investigator went up

21  there and said: I could see without binoculars.

22          The next witness you had was William

23  Scott. William Scott, 36 year old man.

1    February 15th, he was about 34. He went to New

2    Street to buy some crack. That's exactly what he

3    got. Mr. Scott testified that when he got there,

4    he saw the defendant and he flagged him down. So

5    he pulled over, and the defendant asked, "What do

6    you want?" He said, "What do you want?" And

7    that's the same thing that Corporal Hosfelt said.

8         He also testified that the defendant was

9    the only person who came up to his car. He was

10   cross-examined a whole lot about where his face was

11   and how he was able to observe the defendant's

12   face. But you all saw, even from the defendant's

13   own mouth, when I said: Well, how far away were

14   you from Mr. Scott when you went up to his car and

15   you all had an opportunity to observe just how

16   close he was? He could reach out and touch the

17   defendant's face. That's how close he was when he

18   said that's how far he was from Mr. Scott's face.

19        Now, Mr. Scott testified that he is

20   positive that's the guy who sold him the crack, and

21   it was only one person he dealt with. He was

22   positive. He was even asked at the end of his

23   testimony, was asked: It's important, are you

1    sure?  He said:  Absolutely positive.

2            Consider also, isn't Corporal Hosfelt

3    and Mr. Scott's testimony completely consistent?

4    Now, you have a fifteen, sixteen year veteran

5    police officer, now a sergeant.  And you also have

6    a recovering crack addict telling the exact same

7    story, or at least describing consistent events.

8    It's too unlikely people to actually testify the

9    same way.  Now, whether they testified in the same

10   way, obviously, is up to you all to decide, but the

11   facts show that they, or the evidence shows that

12   they testified completely consistent.

13           Officer Sherwood stopped Mr. Scott just

14   around the corner and recovered the crack cocaine

15   that the defendant sold him.  Corporal DiGirolomo

16   arrested the defendant right out in front of Kent

17   Apartments, right where they made the crack deal.

18           Next witness was Mr. Madhaven who has

19   thirty years of experience as a forensic chemist.

20   Remember Sherwood said:  I recovered the crack from

21   the car, I put it into at that little envelope and

22   then took it back, kept it in my possession, went

23   back to the Dover PD, put it in an envelope and

Jennie L. Washington
Official Court Reporter

1    sealed it, placed in the secured evidence locker.

2    It went up to the ME's office. When it arrived

3    there, they look at it and it was sealed. Of

4    course it hadn't been tampered with.

5            Mr. Madhaven said if it appeared though

6    it had been tampered with, he would have never

7    analyzed it. He analyzed it, subjected it to the

8    not one, not two, but three separate tests and

9    confirmed that it was crack cocaine.

10            Now, the defendant testified in this

11    case that you all just heard. As with any witness,

12    you must determine how much weight to be given to

13    his testimony, but you should consider as the

14    instructions advised you, consider the

15    reasonableness or unreasonableness, the motives

16    actuating him, whether his testimony has been

17    contradicted his bias or prejudice or interest in

18    the proceeding, and his demeanor on the witness

19    stand.

20            Now, again, the credibility of witnesses

21    is solely within the province of the jury, and the

22    State doesn't stand up here suggesting what value

23    to be given. The State is only suggesting facts

Fact 3

1   that you all should consider when you go back to

2   deliberate among yourselves.  But you should

3   consider, again, that Hosfelt and Scott tell the

4   same story.  You have a recovering crack addict and

5   a police officer, too unlikely pairs telling the

6   same story.

7          The defendant, corroborates a lot of

8   what they say; the only thing he really says

9   differently is:  I didn't sell him crack, it was

10  some other dude.  I've considered the details he

11  gives you when he says what happened:  I didn't see

12  anything happen, some guy touched me on the

13  shoulder, I didn't see anything else.  Does that

14  seem strange to you?  Or do you think, considering

15  the other testimony, was it the defendant who

16  actually delivered it?  And Scott said he delivered

17  and so did Hosfelt.

18          You also have to consider the

19  reasonableness to what the defendant did testify

20  to.  Consider he knew it was a drug neighborhood.

21  He approaches a strange car with an individual that

22  he's never met before in his whole life and says:

23  Who you looking for?  At least today, he testified

Jennie L. Washington
Official Court Reporter

1    to today: Who you looking for? But he also made a

2    prior statement that he made -- it escapes me and I

3    don't want to misrepresent it. You all remember

4    the statement it was that we are talking about.

5    Who do you want is what he said the prior statement

6    he made.

7         Now, remember, when he was asked about

8    those two different statements he said he was

9    asked: Are you sure you said who you looking for?

10    He said: Yeah, I'm sure. Then he was confronted

11    with the other statement and he said: Well, that

12    was two years ago. So consider the consistency of

13    his statement, whether it's contradicted.

14         But consider, does it make sense that a

15    guy who is not a drug dealer is going to approach a

16    strange car in a drug neighborhood and start

17    engaging in conversation: Who you looking for?

18    Now, the defendant stated: I didn't sell Mr. Scott

19    any crack. Sergeant Hosfelt said he watched the

20    entire transaction. Only one person approaches the

21    car; that's the defendant.

22         The defendant admits he approached the

23    car. Mr. Scott says, one person approaches his

Jennie L. Washington
Official Court Reporter

1   car, and he saw his face and he's positive it's the

2   defendant.  Now, based on what the defendant said,

3   out of the defendant's own mouth, he was within

4   almost arm's length, that's how close they were.

5   You all saw how close I got to the defendant before

6   he said that's about how close he was.  And then

7   the defendant comes around after the fact and says:

8   It was some guy named Stefan Powell, it wasn't me.

9   It was some guy named Stefan Powell.  Well, where

10   did he get that name?

11         Well he testified two years ago that he

12   didn't know this guy's name and some guys in jail

13   gave him the name, some guys who had been shooting

14   at him.  What does he tell you today?  Today he

15   says:  Well, he was affected by crack.  And then he

16   said:  Well, I had an anger problem, that's why I

17   testified differently two years ago than today.

18   But today he testified:  Sure, I know who he was.

19   I knew who he was at the time, I knew his mom.  But

20   he said he got the guy's name from some guys in

21   jail, some enemies of Stefan Powell.  Why he did it

22   was because he wanted to put the attention on

23   somebody else.  He wanted to have a scapegoat.

Jennie L. Washington
Official Court Reporter

1      What does it tell you about the

2  defendant's testimony if he testifies differently

3  about same facts on two different occasions?

4  Consider, does the defendant have an interest in

5  this case?  Does he have an interest in this case?

6  You bet.  And finally, consider the defendant

7  admitted that he has previously been convicted of a

8  crime of dishonesty.

9          There's only one person that approached

10  William Scott's car to sell him crack cocaine.

11  Mr. Scott said he was absolutely positive it was

12  the defendant.  Sergeant Hosfelt said that was the

13  guy, there was only one guy.  The defendant admits

14  he approached the car.  Since there's only one

15  person who delivered the crack to Mr. Scott, it's

16  the defendant, that's what the evidence showed in

17  this case.

18          I will have one more opportunity to

19  address you all after Ms. Dean does.

20          THE COURT:  All right.  Ms. Dean, for

21  the defense.

22              * * * * *

23          DEFENDANT'S CLOSING ARGUMENTS

facts

Grand
Jury

```
 1    Courtroom No. 1
      9:30 o'clock a.m.
 2    May 23, 2003

 3                    PROCEEDINGS

 4                    *  *  *  *  *

 5              MR. KRINER:  Your Honor, the State is

 6    ready to proceed in the sentencing of Roland

 7    Williams.  I guess prior to moving the sentencing,

 8    the State has a petition before the Court to

 9    declare the defendant an habitual offender.  And I

10    believe there's a whole lot -- I don't believe

11    there's a whole lot the State needs to put before

12    the Court, since we had a prior hearing at which

13    time the Court declared the defendant an habitual

14    offender.

15              The only difference, obviously, was it

16    was sent back for a new trial from the Supreme

17    Court.  At that time, the defendant was once again

18    convicted of delivery of cocaine.  So it didn't

19    change anything with respect to the predicate

20    offenses.

21              The State believes based on its motion,

22    that you should declare the defendant an habitual

23    offender and sentence him to life in prison.
```

Jennie L. Washington
Official Court Reporter

The movant

```
 1              MS. DEAN:  Your Honor, first, in regard
 2    to the habitual offender motion, I've explained to
 3    Mr. Williams that this motion, this habitual
 4    offender statute is the law of the case because it
 5    was challenged at his first sentencing.  It went up
 6    to the Supreme Court and the Supreme Court upheld
 7    that and said, yes, he is an habitual offender.  So
 8    I've explained, and he understands that we cannot
 9    make any further argument now about the motion.  So
10    I believe the Court is required to grant the
11    motion, since because it's been upheld by the
12    Delaware Supreme Court.
13              In regard to the sentence, the Court has
14    no discretion under Section 4215(b).  The Court
15    must impose a life sentence, so I have no further
16    comments.
17              THE COURT:  Thank you, Ms. Dean.  Before
18    I allow Mr. Williams to respond to the Court, your
19    recitation of where we stand with respect to this
20    situation is correct.  The State has, of course,
21    filed its motion to declare Mr. Williams as an
22    habitual offender.  It is the law of the case.  And
23    the Court has no discretion in this regard.  The
```

Jennie L. Washington
Official Court Reporter

1    Court will grant that motion.

2            Now, before I continue, Mr. Williams, do

3    you have anything you want to offer to the Court?

4    *LAST WORDS*  THE DEFENDANT:  I just want to say that

5    I forgive the State of Delaware, because I don't

6    feel like I had a fair trial for my first trial.

7    And then on the second trial I was put on

8    medication, and I was very rejected in my second

9    trial; and I still don't feel like I had a fair

10   trial in this state, even though I wasn't born in

11   this state, and I never caused any problems in this

12   state.  And the State don't really know, but I do

13   accept the fate of another man's definite power, if

14   that's what the State sees, and that's what the

15   State said they found me guilty of which I still

16   stand up that I'm not guilty of the crime.  And the

17   witnesses that was with me on the night of the

18   crime, they was dismissed, they never could get

19   located to come forward and testify on my behalf.

20           I came down to this State to work in

21   potatoes, and I got hemmed up in the wrong area.

22   And I'd just like to say on this day, I accept the

23   fate from the State, even though I'm not from this

Jennie L. Washington
Official Court Reporter

```
 1    state, and I don't feel like it was fair for the
 2    burden of another man to be on my shoulders for the
 3    rest of my life.  But I forgive you in the name of
 4    the Lord, Jesus Christ, and as the judge, I don't
 5    feel like you was fair in my first trial, and I
 6    don't feel like the State was fair for targeting my
 7    Florida State conviction from the beginning of my
 8    first trial to the beginning of my second trial.
 9    And you put me on medications to confuse me in my
10    second trial, and then to hold up something against
11    me that I forgot that I said in my first trial is
12    what wasn't fair.
13              That's all I got to say.  But I forgive
14    you.
15              THE COURT:  All right, thank you very
16    much.
17              Mr. Kriner, any comments from the State?
18              MR. KRINER:  No, Your Honor.
19              THE COURT:  Okay.  With reference to
20    Mr. Williams' situation, the Court will, of course,
21    acknowledge his comments on the record.  I also
22    acknowledge the comments of his attorney, Ms. Dean,
23    as well as having accorded an opportunity for the
```

Jennie L. Washington
Official Court Reporter